No. 44,513

STATE OF KANSAS, ex rel. ROBERT C. LONDERHOLM, *Appellant* and *Cross-Appellee,* v. A QUANTITY OF COPIES OF BOOKS, *Appellees* and *Cross-Appellants,* FRANCIS G. VATER and JOE RECTOR, JR., Co-partners, doing business as Rector's Book Store, Wichita, Kansas, *Intervenors-Appellees* and *Cross-Appellants.*

(416 P. 2d 703)

Opinion filed July 14, 1966.

*Richard H. Seaton,* assistant attorney general, argued the cause, and *Robert C. Londerholm,* attorney general, and *Park McGee,* assistant attorney general, were with him on the briefs for the appellant and cross-appellee.

*William I. Robinson,* of Wichita, argued the cause, and *Mark H. Adams, Charles E. Jones J. Ashford Manka, Clifford L. Malone, Mark H. Adams, II, John S. Seeber, Floyd E. Jensen, Philip L. Bowman,* and *Robert Hall,* all of Wichita, were with him on the briefs for the intervenors-appellees and cross-appellants. Of counsel: *Joe Rolston,* Wichita, *Stanley Fleishman* and *Sam Rosenwein,* Hollywood, California.

The opinion of the court was delivered by

HARMAN, C.: At issue here is the liability to state seizure and destruction of eleven allegedly obscene books in an *in rem* action brought pursuant to K. S. A. 21-1102c.

On July 24, 1964, the then attorney general of Kansas filed in the court below an information alleging that copies of the books in question were being kept for sale at Rector's Book Store in Wichita; that they were obscene and thus in violation of K. S. A. 21-1102. The information requested that an order be issued to the owners of the books to show cause why a warrant for seizure of these books should not issue. A copy of each book was filed with the information. The same day the judge of division No. 2 of said court entered an order that any person having any interest in said books should

appear and show cause why a warrant should not be issued directing the seizure of said books by the sheriff of said county, and setting a hearing thereon on July 31, 1964.

On July 31, 1964, the owners of the book store intervened and moved to (1) quash the information and to dismiss the proceedings, (2) for a jury trial and (3) for a continuance of the hearing on the merits. The first two motions were overruled and the latter was granted. The owners then moved that the judge of division No. 2 disqualify himself in the case because it appeared from the show cause order issued by him that he had read three of the books and had examined the other eight, and had made a finding "that there is reason to believe that said books are obscene."

This motion was sustained and the case was reassigned to division No. 6 of the same court. Here motions to quash and dismiss and for a jury trial, identical to the previous ones were made and overruled. As a result of pretrial conference the parties entered into certain stipulations including the following:

"1. Agents or representatives of the Attorney General in the month of July, 1964, purchased from open counters or rack displays, where they were offered for sale to the general public, the eleven titles named in the Information, said titles having been filed in this proceeding as Exhibits 'A' through 'K', at Rector's Book Store, 133 North Broadway, Wichita, Kansas.

"2. Francis G. Vater and Joe Rector, Jr. are co-partners operating Rector's Book Store, at 133 North Broadway, Wichita, Kansas, and in the course of a year's business in that store handle and offer for sale to the general public large quantities of written and printed publications of all kinds dealing with every conceivable subject; that such written and printed publications are supplied by established publishing houses and comprise daily and weekly newspapers, magazines, books and prints containing material concerning religion, philosophy, science, literature, art, and all subjects relating to ideas and the graphic arts of interest to readers and students of printed words and ideas and the graphic arts; that everyone patronizing Rector's Book Store has a free choice in the purchase of the printed matter for sale at the store; that the proprietors of Rector's Book Store have not read the eleven titles involved in this action and do not read nor presume to read as a matter of course the printed material which is offered for sale in such store."

Trial was had December 10, 1964. The plaintiff introduced into evidence copies of the eleven books and rested. The defendants then moved to dismiss upon the grounds the plaintiff had not sustained its burden of proof. The trial judge took this motion under advisement. The defendant owners then offered the testimony of an associate professor of English at Wichita University, and they also offered into evidence copies of nine different books by well-

known authors, concerning which the professor testified, as well as the challenged books. The judge of division No. 6 who heard the above passed away prior to rendition of any decision. By agreement of the parties the case was eventually reassigned to division No. 7 for decision on the record already made. Thereafter the judge of that division entered his memorandum opinion upholding the procedure used but finding that the books were not obscene and denying the requested seizure warrant.

The plaintiff has appealed from such finding and order, and the defendants have cross-appealed from the earlier orders denying their motion to quash and to dismiss and for jury trial.

Plaintiff, referred to hereafter as appellant, asserts the trial court erred as a matter of law in concluding that the questioned books are not obscene within the meaning of K. S. A. 21-1102 and in refusing to issue a seizure warrant pursuant to K. S. A. 21-1102c. Defendants, referred to hereafter as appellees, urge that the books are not obscene and are within the protection of the first and fourteenth amendments to the constitution of the United States and section 11 of the bill of rights of the Kansas constitution.

The first amendment to the federal constitution provides in part:

"Congress shall make no law . . . abridging the freedom of speech, or of the press. . . ."

The fourteenth amendment provides in pertinent part:

". . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

And section 11 of our own bill of rights provides:

"The liberty of the press shall be inviolate: and all persons may freely speak, write or publish their sentiments on all subjects, being responsible for the abuse of such right. . . ."

K. S. A. 21-1102 provides in pertinent part:

"(a) Any person who shall . . . sell . . . or distribute any book . . . publication or other thing, containing obscene, immoral, lewd or lascivious language, or obscene . . . descriptions, manifestly tending to the corruption of the morals of persons . . . shall be guilty of a misdemeanor. . . .

"(b) The test to be applied in cases under subsection (a) of this section shall not be whether sexual desires or sexually improper thoughts would be aroused in those comprising a particular segment of the community, the young, the immature or the highly prudish, or would leave another segment, the scientific or highly educated or the so-called worldly wise and sophisticated,

indifferent and unmoved. But such test shall be the effect of the book, picture or other subject to complaint considered as a whole, not upon any particular class, but upon all those whom it is likely to reach, that is, its impact upon the average person in the community. The book, picture or other subject of complaint must be judged as a whole in its entire context, not by considering detached or separate portions only, and by the standards of common conscience of the community of the contemporary period of the violation charged."

K. S. A. 21-1102a provides in part:

"Any person who . . . distributes for resale or for reading . . . any book, magazine or pamphlet, so composed as to constitute a compilation of . . . words, stories . . . featuring and primarily devoted for the purpose of commercial exploitation, to the description or portrayal or suggestion of illicit sex, or sexual relations, of perversion, lust or sexual passion, or to any combination . . . thereof, shall be guilty of a violation of section 1 [21-1102] of this act. . . ."

And K. S. A. 21-1102c establishes a procedure for the issuance of search warrants, and for seizure and destruction of material found to be in violation of the foregoing statutes.

A leading case on obscenity has been *Roth v. United States*, 354 U. S. 476 1 L. ed. 2d 1948, 77 S. Ct. 1304, decided in 1957. There it was said that obscenity is not within the area of constitutionally protected freedom of speech or press either under the first amendment as to the federal government or under the due process clause of the fourteenth amendment as to the states. The court stated:

"The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." (p. 484.)

The court further said:

". . . sex and obscenity are not synonymous. Obscene material is material which deals with sex in a manner appealing to prurient interest." (p. 487.)

The court quoted approvingly the following definition of obscenity:

" 'A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, *i. e.*, a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters. . . .' " (Footnote 20, p. 487.)

And the court established the following test for obscenity:

". . . whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." (p. 489.)

Thereafter this court had before it the subject of obscenity in

*State v. A Quantity of Books,* 191 Kan. 13, 379 P. 2d 254, decided March 2, 1963 (reversed on procedural grounds in *A Quantity of Books v. Kansas,* 378 U. S. 205, 12 L. ed. 2d 809, 84 S. Ct. 1723, decided June 22, 1964). The thirty-one books there involved were held to be obscene within the *Roth* definition.

Next we need notice *Jacobellis v. Ohio,* 378 U. S. 184, 12 L. ed. 2d 793, 84 S. Ct. 1676, decided June 22, 1964. The court specifically adhered to its obscenity test announced in *Roth* and further stated:

"We would reiterate, however, our recognition in *Roth* that obscenity is excluded from the constitutional protection only because it is 'utterly without redeeming social importance,' and that 'the portrayal of sex, *e. g.,* in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press.' *Id.,* at 484, 487. It follows that material dealing with sex in a manner that advocates ideas, *Kingsley Int'l Pictures Corp. v. Regents,* 360 U. S. 684, or that has literary or scientific or artistic value or any other form of social importance, may not be branded as obscenity and denied the constitutional protection. Nor may the constitutional status of the material be made to turn on a 'weighing' of its social importance against its prurient appeal, for a work cannot be proscribed unless it is 'utterly' without social importance. See *Zeitlin v. Arnebergh,* 59 Cal. 2d 901, 920, 383 P. 2d 152, 165, 31 Cal. Rptr. 800, 813 (1963). It should also be recognized that the *Roth* standard requires in the first instance a finding that the material 'goes substantially beyond customary limits of candor in description or representation of such matters.' " (p. 191.)

Additionally, the court stated that the "contemporary community standards" aspects of the *Roth* test is to be determined on the basis of a national standard rather than those of the particular local community from which the case arose.

Standards for governmental control of obscenity were further consolidated in *Memoirs v. Massachusetts,* 383 U. S. 413, 16 L. ed. 2d 1, 86 S. Ct. 975 (the Fanny Hill book), decided March 21, 1966, with the result it can now be said that each of the following elements must independently be satisfied before a book can be held obscene: (1) The dominant theme of the material taken as a whole appeals to a prurient sexual interest of the average person; (2) the material is patently offensive because it affronts contemporary community standards relating to the description of sexual matters; and (3) the material is utterly without redeeming social value. And in the same case as well as in two others decided the same day (*Ginzburg v. United States,* 383 U. S. 463, 16 L. ed. 2d 31, 86 S. Ct. 969; and *Mishkin v. New York,* 383 U. S. 502, 16 L. ed. 2d 56, 86 S. Ct. 958) there seems to be emerging the principle that in close cases of obscenity the so-called "packaging" or advertising of material is rele-

vant and may be considered as a part of the content of the material itself where that packaging or promotion indicates exploitation entirely on the basis of prurient appeal.

Preliminary to application of the foregoing to the case at bar, we should note the scope of our review. Appellees urge that it should be limited to determining only whether the ruling below is supported by sufficient evidence. We do not agree. In *Jacobellis*, where there had been a finding of obscenity in a questioned film in the court below, the court was asked to make this same approach. It was rejected after considerable discussion, and citation of authority, the court stating:

". . . we reaffirm the principle that, in 'obscenity' cases as in all others involving rights derived from the First Amendment guarantees of free expression, this Court cannot avoid making an independent constitutional judgment on the facts of the case as to whether the material involved is constitutionally protected." (p. 190.)

We think that view sound. (See, also, cases cited at anno. 5 A. L. R. 3d 1158, 1191-1193.) Constitutional judgments are for ultimate decision of this court; here the entire record will be reviewed independently as to constitutional protection to be afforded the questioned material. We have no problem of weighing conflicting evidence upon disputed questions of fact.

As to the eleven books we conclude that the dominant theme of the material taken as a whole appeals to a prurient sexual interest of the average person and that the material is patently offensive because it goes beyond and affronts contemporary community standards relating to the description of sexual matters. In reaching this conclusion we have considered, and not overlooked, the evidence offered by appellees. We do not deem it necessary to set forth in any detail the contents of the books. Their titles are appended hereto together with the descriptive blurbs or subtitles immediately preceding them on the covers. These give more than a hint of the nature of the contents. For all intents and purposes the books are indistinguishable from those found to be "hard core pornography" by this court in *State v. A Quantity of Books*, supra. Suffice it to say the eleven books here considered relate, to the exclusion of anything else, the illicit sexual capers of the principal figures, running the gamut in drawn out episodic form, chapter by chapter, of feats of sexual prowess and perversion in one form or another. Each is nothing more than a series of vulgar caricatures, patently offensive, with no appeal of any kind except to the prurient.

We have little difficulty in concluding this material, weighed separately from the foregoing, is utterly without redeeming social importance. The word "redeeming" is a somewhat elusive term difficult to lay hold of firmly. Webster's Third New International Dictionary defines it as "serving to offset or compensate for a defect." The term implies something of merit or value. None of these books makes any effort at characterization or insight into human nature, no attempt is made to portray reality, no ideas are presented, no story is told, nothing is said to advance human knowledge or understanding in science, literature or art. Further negations could be made. It is not that the books lack literary merit—which they do—they simply lack any redemptive features of social value or importance.

If the obscene nature of these books be deemed doubtful, that doubt would certainly have to be resolved against them when we consider their packaging in the light of the positive judgments in *Ginzburg* and *Mishkin,* and in the warning in *Memoirs,* that,

". . . the circumstances of production, sale, and publicity are relevant in determining whether or not the publication or distribution of the book is constitutionally protected. Evidence that the book was commercially exploited for the sake of prurient appeal, to the exclusion of all other values, might justify the conclusion that the book was utterly without redeeming social importance. It is not that in such a setting the social value test is relaxed so as to dispense with the requirement that a book be *utterly* devoid of social value, but rather that, as we elaborate in *Ginzburg v. United States, post,* pp. 470-473, where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, a court could accept his evaluation at its face value." (p. 420.)

In *Mishkin* the defendant publisher was prosecuted for violation of state obscenity statutes including one for possession of obscene books with intent to sell similar to our own. In affirming his conviction, the court included this description of the books:

"Fifty books are involved in this case. They portray sexuality in many guises. Some depict relatively normal heterosexual relations, but more depict such deviations as sado-masochism, fetishism, and homosexuality. Many have covers with drawings of scantily clad women being whipped, beaten, tortured, or abused. Many, if not most, are photo-offsets of typewritten books written and illustrated by authors and artists according to detailed instructions given by the appellant. Typical of appellant's instructions was that related by one author who testified that appellant insisted that the books be 'full of sex scenes and lesbian scenes . . . [T]he sex had to be very strong, it had to be rough, it had to be clearly spelled out. . . . I had to write sex very bluntly, make the sex scenes very strong. . . . [T]he sex scenes had to be unusual sex scenes between men and women, and women and women,

and men and men. . . . [H]e wanted scenes in which women were making love with women. . . . [H]e wanted sex scenes . . . in which there were lesbian scenes. He didn't call it lesbian, but he described women making love to women and men . . . making love to men, and there were spankings and scenes—sex in an abnormal and irregular fashion.' . . . Artists testified in similar vein as to appellant's instructions regarding illustrations and covers for the books." (p. 505.)

The writer of the foregoing could well have been discussing the eleven books in the instant case, as reflected by the lurid illustrated covers as well as the printed pages. Additionally each of the eleven contains a frontispiece paragraph and one on the back cover blatantly pointing up the strong sex. No other appeal is made. The format is the same in all the books—paperback—obviously mass produced, exactly 190 pages in length, strong sex and perversion with repetitive regularity in each chapter, literally appealing to pruriency from cover to cover.

In *Ginzburg*, a prosecution for violation of federal laws prohibiting the mailing of obscene matter, the court discussed evidence of the methods of advertising the challenged publications, and commented thereon as follows:

"This evidence, in our view, was relevant in determining the ultimate question of obscenity and, in the context of this record, serves to resolve all ambiguity and doubt. The deliberate representation of petitioners' publications as erotically arousing, for example, stimulated the reader to accept them as prurient; he looks for titillation, not for saving intellectual content. Similarly, such representation would tend to force public confrontation with the potentially offensive aspects of the work; the brazenness of such an appeal heightens the offensiveness of the publications to those who are offended by such material. And the circumstances of presentation and dissemination of material are equally relevant to determining whether social importance claimed for material in the courtroom was, in the circumstances, pretense or reality— whether it was the basis upon which it was traded in the marketplace or a spurious claim for litigation purposes. Where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, that fact may be decisive in the determination of obscenity. [p. 470]

. . . . . . . . . . . . . . . . .

"We perceive no threat to First Amendment guarantees in thus holding that in close cases evidence of pandering may be probative with respect to the nature of the material in question and thus satisfy the *Roth* test. . . ." (p. 474.)

The packaging simply evidences the publisher's estimate of what his products really are, and this is acceptable evidence. Here that packaging strongly emphasizes the prurient interest as well as affrontry to accepted standards in sexual matters, and it just as

strongly belies any redeeming social value. We recognize the intervenors are not the publishers and are not on trial; it is the books which are on trial. They brazenly proclaim the motive in their creation and exploitation.

In due deference to the judge in the court below who gave extended consideration to this case it should be noted the last three decisions mentioned above were announced by the Supreme Court of the United States after his judgment herein.

Appellees rely heavily on the fact the nine books offered into evidence by them, some being best sellers and in wide circulation in this country, contain vivid sexual depictions as well as liberal use of what has come to be denoted "four letter" Anglo-Saxon words (the latter being absent in the eleven questioned books). They argue the eleven are less offensive. Without laboring the proposition it can hardly be denied that these nine books could be considered to have some redeeming social values to compensate for the strong sex, and this is a distinguishing feature. This court, therefore, determines that the eleven books are obscene and may not be lawfully offered for sale, and hence are subject to seizure under K. S. A. 21-1102c.

By way of cross-appeal appellees raise substantially three questions. They say the statutes under which this proceeding was brought are unconstitutionally vague and indefinite. We have heretofore quoted K. S. A. 21-1102, 21-1102a and 21-1102c which are to be construed together. Exactly the same attack was made in *State v. A Quantity of Books*, supra, and answered adversely to appellees' contentions by this court when it stated: "We believe that the test for obscenity which is provided is adequate. . . ." (p. 15.)

The standards of obscenity contained in our statutes are within permissible constitutional limits.

Appellees' second contention, that they were wrongfully denied a jury trial, was likewise answered adversely in *State v. A Quantity of Books*, supra. There this court pointed out that this type of action is a civil action growing out of statute in which there is no right to a jury trial, none having existed at common law. We see no reason to depart from the principles announced in the foregoing.

Finally, appellees contend that inasmuch as K. S. A. 21-1102c does not specifically provide for an adversary hearing on the question of obscenity of the material before a search warrant is issued, this necessary procedural element may not be supplied with the

result that K. S. A. 21-1102c lacks due process and may not lawfully be used.

An adversary hearing was provided in this case, as heretofore stated. To understand better what is involved here the reader should recall that the decision of this court in *State v. A Quantity of Books,* supra, was reversed by the Supreme Court of the United States on the basis that the procedure followed did not meet constitutional standards required by the due process clause of the fourteenth amendment. The question of obscenity of the material was not reached. The procedural deficiency, as determined by four members of that court, was that there was no adversary hearing on the question of obscenity of the books prior to seizure thereof. Because two other members of the court thought that the first amendment does not permit any suppression of obscenity whatsoever, the decision of this court was reversed (*A Quantity of Books v. Kansas,* 378 U. S. 205, 12 L. ed. 2d 809, 84 S. Ct. 1723).

In instituting this proceeding the state requested an order, which was granted, directed to the owners of the books to show cause why a warrant for seizure of the books should not issue. There was no seizure warrant issued at the time the proceeding was started and since the trial court found after the adversary hearing that the books were not obscene no warrant has ever been issued. There has been no repression or restraint of the books at any time. Not a single copy of any book was ever seized. The copies used as exhibits were purchased at retail. We think constitutional safeguards have been supplied and not improperly so. In reality appellees are objecting to being given an adversary hearing as a part of due process, not because it injures them but because without it the state would be powerless to enforce the statute.

The concept of providing a hearing to conform a statute to the constitutional requirements of due process is not novel. Our habitual criminal act (K. S. A. 21-107a) has never expressly provided for a hearing on the question of prior felony convictions. Nevertheless this court has held that the requirements of due process include the right to such a hearing and that it therefore must be made available under that statute (see *Levell v. Simpson,* 142 Kan. 892, 52 P. 2d 372). In *Cities Service Gas Co. v. State Corporation Commission,* 192 Kan. 707, 391 P. 2d 74, we find this:

". . . this court has recognized the rule that where no express provision for notice is made in the statute, if there be nothing in the statute which prevents notice from being given, the requirement of reasonable notice will be implied. [Citations.]" (p. 713.)

In view of the foregoing, upon cross-appeal the orders of the trial court overruling the motion to quash and dismiss and denying a jury trial are affirmed. Upon appeal, its judgment that the eleven books are not obscene is reversed with directions for further proceedings in harmony with this opinion.

APPROVED BY THE COURT.

---

### APPENDIX

(State's exhibits "A" through "K.")

Lost in Lust She Became a Passion Addict!
SIN HOOKED.

Wanton Passion was the Secret of These—
BAYOU SINNERS.

Wild Passions Bought Them Shame and Pain!
LUST HUNGRY.

He Worked Bodies of Marble and Sin in His
SHAME SHOP.

Her Body was the Ticket to a Shame Career!
FLESHPOT.

Her Act was a Fake but Her Lust Secrets Real!
SINNERS SEANCE.

In a Sin Jungle of Voodoo Lust She was the—
PASSION PRIESTESS.

They Lived Their Twisted Life of Lust as—
PENTHOUSE PAGANS.

Twisted Hungers Were Placed on Sale in This—
SHAME MARKET.

In a Passion Camp of Lust He Ruled as—
SIN WARDEN.

Passion Drove Him on a Lust Hunt to Vengeance!
FLESH AVENGER.