GROVE PRESS, INC., Plaintiff,

v.

STATE OF KANSAS, James W. Bouska and Herbert W. Walton, Defendants.

LAKESIDE DRIVE IN THEATER, INC., Plaintiff,

v.

Francis D. MENGHINI, Individually and as County Attorney of Wyandotte County, Kansas; O. Q. Claflin, III, Judge of the District Court of Wyandotte County, Kansas, Division 1; Harry G. Miller, Judge of the District Court of Wyandotte County, Kansas, Division 3; Leo J. Moroney, Judge of the District Court of Wyandotte County, Kansas, Division 5; and the State of Kansas, Defendants.

Nos. KC–2992, KC–2997.

United States District Court
D. Kansas.

Oct. 6, 1969.

384

Stuart D. Mitchelson, of Pflumm, Mitchelson & Amrein, Shawnee Mission, Kan., Walter J. Kennedy, of Hoskins, King, Springer, McGannon & Hahn, Robert B. Olsen, of Olsen & Talpers, and Irving Achtenberg, of Achtenberg, Sandler & Balkin, Kansas City, Mo., for plaintiff Grove Press, Inc.

Kent Frizzell, Atty. Gen., and Richard H. Seaton, Asst. Atty. Gen., Topeka, Kan., for defendant State of Kansas.

James W. Bouska, County Atty., Olathe, Kan., pro se and for defendant State of Kansas.

Bernis G. Terry, Asst. County Atty., Olathe, Kan., for defendants James W. Bouska and State of Kansas.

Eugene T. Hackler and Robert C. Londerholm, of Hackler, Anderson, Londerholm, Speer & Vader, Olathe, Kan., for defendant Herbert W. Walton.

Charles P. Fleming, Jr., Mission, Kan., and Kenneth E. Bigus, Kansas City, Mo., for plaintiff Lakeside Drive In Theater, Inc.

Francis D. Menghini, County Atty., Kansas City, Kan., pro se, and with Jerome S. Koehler, Jr., Asst. County Atty., Kansas City, Kan., for defendants O. Q. Claflin III, Harry G. Miller and Leo J. Moroney.

Before HICKEY, Circuit Judge, and STANLEY and THEIS, District Judges.

## OPINION

### PER CURIAM.

In each of these cases the same statutes of the State of Kansas are challenged as violative of the Federal Constitution. A three-judge court of identical composition has been constituted in each case. By agreement of the parties, the cases were consolidated for hearing and decision.

### THE GROVE PRESS CASE

In this action, the plaintiff seeks a judgment declaring K.S.A. 21–1102 and K.S.A. 21–1102c [1] unconstitutional, and

1. "*21–1102. Obscene literature; unlawful acts; penalty; test as to obscenity.* (a) Any person who shall import, print, publish, sell, design, prepare, loan, give away or distribute any book, magazine, newspaper, writing pamphlet, ballad, printed paper, print, picture, drawing, photograph, publication or other thing, containing obscene, immoral, lewd or lascivious language, or obscene, immoral, lewd or lascivious prints, pictures, figures or descriptions, manifestly tending to the corruption of the morals of persons, or shall introduce into any family, school or place of education or shall buy, procure, receive or have in his possession, any such book, pamphlet, magazine, newspaper, writing, ballad, printed paper, print, picture, drawing, photograph, publication or other thing, either for the purpose of sale, exhibition, loan or circulation, or with intent to introduce the same into any family, school or place of education, shall be guilty of a misdemeanor, and upon conviction thereof shall be fined not less than five (5) nor more than three hundred dollars ($300), or be imprisoned not to exceed thirty (30) days, or both.

"(b) The test to be applied in cases under subsection (a) of this section shall not be whether sexual desires or sexually improper thoughts would be aroused in those comprising a particular segment of the community, the young, the immature or the highly prudish, or would leave another segment, the scientific or highly educated or the so-called worldly wise and sophisticated, indifferent and unmoved. But such test shall be the effect of the book, picture or other subject to complaint considered as a whole, not upon any particular class, but upon all those whom it is likely to reach, that is,

its impact upon the average person in the community. The book, picture or other subject of complaint must be judged as a whole in its entire context, not by considering detached or separate portions only, and by the standards of common conscience of the community of the contemporary period of the violation charged."

"*21–1102c. Same; search warrant; seizure and destruction, when.* Whenever any district, county, common pleas, or city court judge or justice of the peace shall receive an information or complaint, signed and verified upon information and belief by the county attorney or the attorney general, stating there is any prohibited lewd, lascivious or obscene book, magazine, newspaper, writing, pamphlet, ballad, printed paper, print, picture, motion pictures, drawing, photograph, publication or other thing, as set out in section 1 [21–1102] (a) of this act, located within his county, it shall be the duty of such judge to forthwith issue his search warrant directed to the sheriff or any other duly constituted peace officer to seize and bring before said judge or justice such a prohibited item or items. Any peace officer seizing such item or items as hereinbefore described shall leave a copy of such warrant with any manager, servant, employee or other person appearing or acting in the capacity of exercising any control over the premises where such item or items are found or, if no person is there found, such warrant may be posted by said peace officer in a conspicuous place upon the premises where found and said warrant shall serve as notice to all interested persons of a hearing to be had at a time not less than ten (10) days after such sei-

enjoining proceedings brought in the District Court of Johnson County, Kansas under those statutes against a motion picture entitled "I Am Curious (Yellow)," made in and imported from Sweden.

Grove Press, Inc., a New York corporation, is the national distributor of the motion picture. Dickinson Operating Co., Inc., a Kansas corporation, operates the Kimo South Theater in Overland Park, a city in Johnson County, Kansas. Grove and Dickinson are parties to a licensing agreement whereby Grove granted to Dickinson the right to exhibit the motion picture at its theater for a period of six weeks, with "(a)dditional time to be negotiated."[2] The defendant James W. Bouska is the County Attorney of Johnson County, Kansas, and the defendant Herbert W. Walton is a Judge of the District Court of Johnson County, Kansas.

Bouska, having himself seen the picture, on June 22 filed in the District Court of Johnson County, Kansas an information under the provisions of K.S.A. 21–1102c, alleging that the film was obscene and requesting the entry of an order directed to persons having an interest in the film or its exhibition to appear on June 23 and show cause why a seizure warrant should not issue. The requested order was entered by Judge Walton and copies served on representatives of Dickinson. At the appointed time, attorneys for Dickinson appeared and Dickinson was permitted to intervene; the film itself was introduced in evidence together with the opinion of the United States Court of Appeals, Second Circuit, in the case of United States v. A Motion Picture Film, 404 F.2d 196 (1968). Arrangements were made for Judge Walton to view the film that evening at a private showing.

■ The hearing on the information was set successively for June 23, June 24, June 25, July 1 and July 2. At each of the first three appearances (June 23, 24 and 25) Bouska announced that the state was ready to proceed with the hearing. At each of those appearances Dickinson's attorneys requested and were granted postponement so that they might have further time to prepare for the hearing. The taking of testimony commenced July 1 and was concluded July 2. Dickinson's attorneys requested that the matter be briefed, with oral argument to follow. The request was granted and a briefing schedule agreed upon, with argument set for August 27.[3]

At the June 23 hearing, Bouska had proposed that Dickinson voluntarily suspend public showing of the film until the question of its obscenity could be judicially determined. The attorneys for

zure. At such hearing, the judge or justice issuing the warrant shall determine whether or not the item or items so seized and brought before him pursuant to said warrant were kept upon the premises where found in violation of any of the provisions of this act. If he shall so find, he shall order such item or items to be destroyed by the sheriff or any duly constituted peace officer by burning or otherwise, at such time as such judge shall order, and satisfactory return thereof made to him: *Provided, however,* Such item or items shall not be destroyed so long as they may be needed as evidence in any criminal prosecution."

2. The licensing agreement contains a provision that: "In the event legal proceedings are instituted against the exhibitor [Dickinson] by any governmental agency concerning the run of I AM CURIOUS (YELLOW) at the Kimo South theater the distributor [Grove] shall have the right to defend the action with legal counsel of his own choice at his expense."

3. We are not impressed by Grove's contention here that, since it was not a party to the state proceedings, it should not be held accountable for delays granted at the request of Dickinson's attorneys. The attorneys who represented Dickinson in the state court represented Grove here. Under the licensing agreement, Grove retained the right to defend cases involving the film which might be brought against Dickinson. By the terms of the same agreement, Grove receives a sizeable percentage of gross receipts realized from the exhibition of the film. In our view, Dickinson was the alter ego of Grove in the state proceedings and the acts of Dickinson's attorneys are imputable to Grove.

Dickinson replied that their client would be consulted and Bouska did not then press for interlocutory relief, conceding that counsel for Dickinson needed more time for preparation. On the 24th, Bouska moved for issuance of a restraining order. The motion was taken under advisement by Judge Walton and on the 25th, Dickinson having declined to suspend the showing, the order was issued. It was not until July 25, the third date set for a hearing, and not until after the film had been introduced in evidence and had been viewed by the judge, that the state court entered a temporary restraining order forbidding its further public showing. It was publicly exhibited June 20, 21, 22, 23 and 24, and was viewed by approximately 4,000 persons.[4]

On June 24, while the state court proceedings were pending, this action was filed on Grove's behalf by the same attorneys who represented Dickinson in the state court.[5] This action has been dismissed as to the State of Kansas, originally named as a party defendant. The Attorney General of Kansas, since a state statute is under attack, has been permitted to appear as amicus curiae.

### THE LAKESIDE CASE

Lakeside Drive In Theater, Inc., a Kansas corporation, operates an open air drive-in theater in Wyandotte County, Kansas. The defendant Francis D. Menghini is County Attorney of Wyandotte County and the defendants O. Q. Claflin III, Harry G. Miller and Leo J. Moroney are Judges of the District Court of Wyandotte County, Kansas. The action has been dismissed as to the defendant State of Kansas and, since the constitutionality of Kansas statutes is under attack, the Attorney General of Kansas has been permitted to appear as amicus curiae.

The screen of Lakeside Theater is easily visible for a distance of about one-half mile from points on two intersecting public highways, one being Kansas State Highway No. 5 and the other the road leading into the Wyandotte County Park, which contains family recreational facilities, including baseball diamonds, picnic grounds and boating. Users of the park facilities and travelers on the highways complained to Menghini that offensive films were being exhibited by Lakeside and were visible to persons not patrons of the theater. After assistant county attorneys had viewed various films, Menghini filed in the District Court of Wyandotte County informations pursuant to K.S.A. 21–1102c, charging that five motion pictures being exhibited by Lakeside were obscene within the meaning of K.S.A. 21–1102.

In each case an order was entered by one or the other of the defendant judges directing that persons having an interest in the named film appear and show cause why a siezure warrant should not issue. In each instance the film was viewed by an assistant county attorney before the information was filed, and in each case, after an ex parte hearing, the order to show cause was issued by the court and served on Lakeside. In none was the seizure warrant issued until after a hearing by the court at which attorneys for Lakeside appeared and Lakeside was permitted to intervene. At each hearing the court found that there was probable cause to believe that the film in question was obscene and ordered its seizure. At each hearing the court heard evidence of the assistant county attorney who had viewed the film, and each judge himself viewed the preview of the film under consideration. Lakeside offered no evidence at any of the hearings. All of the

---

4. A random survey of exiting patrons by police officers revealed that at least three who were under eighteen years of age had not been questioned by the ticket taker as to age. One, aged eighteen, was asked by the ticket seller to produce a driver's license to establish his age. Another, aged eighteen, bought two tickets with-

out challenge by the ticket seller or the ticket taker.

5. An application for an order staying the state court proceedings was denied, as was a subsequent motion to stay enforcement of the temporary restraining order issued June 25 by the state court.

films are now in the custody of the state court.[6]

## DEFENDANTS' MOTIONS TO DISMISS

The defendants in each case moved to dismiss on several grounds. It is these motions which we first consider.

■ Defendants urge initially that, in their capacities as public officials, they are immune from suit. However, state officials, as distinguished from the state itself, are not immune from actions to restrain them from enforcing, or attempting to enforce, state laws which violate the United States Constitution, or from taking unconstitutional action under color of state law. See Georgia R. R. & Banking Co. v. Redwine, 342 U.S. 299, 304, 72 S.Ct. 321, 96 L.Ed. 335 (1952); Pennoyer v. McConnaughy, 140 U.S. 1, 11 S.Ct. 699, 35 L.Ed. 363 (1891); Warner v. Board of Trustees of Police Pension Fund, 277 F.Supp. 736, 739 (E. D.La.1967). Thus, this action, not being one seeking money damages, is not barred.

The defendants next assert that plaintiffs failed affirmatively to show jurisdiction under 28 U.S.C. §§ 1331, 1332 and Rule 8 of the Federal Rules of Civil Procedure, because they fail to show both a matter directly in controversy and the requisite amount of money in controversy.

■ It is clear from the stipulations of the parties, however, that Grove Press has a contract with the local exhibitor which vests in them a continuing direct financial interest in exhibition of the film. Ample demonstration was made of the fact that upon continued showing of the film receipts to Grove Press would probably exceed $10,000. The evidence with respect to Lakeside Theater's interest in the exhibition of the films involved in that case sufficiently establishes the existence of controversy and the requisite jurisdictional amount.

We hold that we have jurisdiction under 28 U.S.C. §§ 1331 and 1332, and therefore find it unnecessary to decide whether an action based upon 42 U.S.C. § 1983 may be maintained by a corporation. And see Hague v. C. I. O., 307 U.S. 496, 527, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); cf. Erlich v. Glasner, 274 F. Supp. 11 (C.D.Cal.1967) and Joe Louis Milk Co. v. Hershey, 243 F.Supp. 351 (N.D.Ill.1965).

Defendants contend that the "anti-injunction" statute, 28 U.S.C. § 2283, forbids the granting of injunctive relief to plaintiffs. That section provides:

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

■ Plaintiffs argue that 42 U.S.C. § 1983 supplies the express congressional authorization contemplated by 28 U.S.C. § 2283. This is the view of the Third Circuit. Cooper v. Hutchinson, 184 F.2d 119 (1950). And see Landry v. Daley, 288 F.Supp. 200 (N.D.Ill.1968) and cases therein cited. The Seventh Circuit has held that § 1983 provides no exception to § 2283. Goss v. State of Illinois, 312 F.2d 257 (1963). And see Mackay v. Nesbett, 285 F.Supp. 498 (D. Alaska 1968) and cases therein cited. In the light of our disposition of this case, we do not feel called upon to choose between the divergent views or to decide whether injunctive relief is barred by 28 U.S.C. § 2283. It is our duty "to decide the appropriateness and the merits of the declaratory request irrespective of [our] conclusion as to the propriety of the issuance of the injunction." Zwickler v. Koota, 389 U.S. 241, 254, 88 S.Ct. 391, 399, 19 L.Ed.2d 444 (1967).

The defendants' motions to dismiss are denied.

6. The films are entitled: "The Ramrodder," "The Head Mistress," "Eat, Drink and Make Merrie," "The Starlett," and "Lila."

## ABSTENTION

Defendants assert that even if 28 U.S.C. § 2283 is not held to limit this court's injunctive power, a consideration of the proper balance of federal-state court systems requires the application of the doctrine of abstention and the rule of comity in the instant cases.

Plaintiffs maintain that the abstention doctrine is inappropriate, citing Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). The decision in *Dombrowski* makes it clear that

" * * * federal interference with a State's good-faith administration of its criminal laws is peculiarly inconsistent with our federal framework. It is generally to be assumed that state courts and prosecutors will observe constitutional limitations as expounded by this Court, and that the mere possibility of erroneous initial application of constitutional standards will usually not amount to the irreparable injury necessary to justify a disruption of orderly state proceedings." 380 U.S. at 484–485, 85 S.Ct. at 1120.

And in Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968), the Court said:

" * * * Federal interference with a State's good-faith administration of its criminal laws 'is peculiarly inconsistent with our federal framework' and a showing of 'special circumstances' beyond the injury incidental to every proceeding brought lawfully and in good faith is requisite to a finding of irreparable injury sufficient to justify the extraordinary remedy of an injunction." 390 U.S. at 618, 88 S.Ct. at 1339.

We find no such "special circumstances" here. The Kansas statutes have been so construed by the Kansas Supreme Court as to bring them within constitutional limits. Twice they have been brought to the attention of the Supreme Court of the United States and, while in both cases their application to the particular circumstances was found violative of constitutional rights, the statutes were not stricken down. The parties have stipulated that there was no claim of bad faith on the part of state authorities.

Application of the abstention doctrine involves discretionary exercise of the court's equity powers. Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). Here the statutes in question have already been interpreted by the state's highest court. State ex rel. Londerholm v. A Quantity of Copies of Books, 197 Kan. 306, 416 P. 2d 703 (1966); State v. A Quantity of Copies of Books, 191 Kan. 13, 379 P.2d 254 (1963). If the plaintiffs were remitted to the state courts, they could easily preserve their right to return to this court for disposition of their federal contentions—the only contentions they urge. England v. Medical Examiners, 375 U.S. 411, 421, 84 S.Ct. 461, 11 L.Ed. 2d 440 (1964). We decline the invitation to abstain.

## THE MERITS

Turning now to the issues common to both cases, the court must rule upon the constitutionality of the Kansas statute (K.S.A. §§ 21–1102 and 21–1102c), and, if constitutional on its face, determine whether the statute was unconstitutionally applied to the plaintiffs.

We hold that the statute is valid on its face. Plaintiffs attack the statute (K.S.A. 21–1102(b)) for failing to set out objective and specific standards of obscenity in conformity with decisions of the Supreme Court. Plaintiffs also attack the statute's vagueness and overbreadth.

As pointed out by the State of Kansas, these same contentions were made to the Supreme Court of Kansas in State ex rel. Londerholm v. A Quantity of Copies of Books, 197 Kan. 306, 416 P.2d 703 (1966). The Kansas Supreme Court rejected these contentions and held that the statute meets federal constitutional requirements because it adopts by implication the standards of Roth v. United States, 354 U.S. 476, 77 S.Ct.

1304, 1 L.Ed.2d 1498 (1957) and its progeny.[7] It is our duty to accept this latter judicial construction of the statute. Shuttlesworth v. Birmingham, 382 U.S. 87, 91, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965). In A Quantity of Copies of Books v. Kansas, 388 U.S. 452, 87 S.Ct. 2104, 18 L.Ed.2d 1314 (1967), the latter state decision was reversed in a per curiam opinion relying on Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L. Ed.2d 515 (1967). The effect of the Kansas court's construction of its statute was not affected, but rather the Supreme Court held the books were *not obscene*. We therefore adhere to the view that the constitutional standards defining obscenity promulgated by the Supreme Court, though not literally present in the statute, are to be implied when the statute is applied. *Cf.* Cambist Films, Inc. v. Tribell, 293 F.Supp. 407 (D. Ky.1968), construing a similar Kentucky statute.

■ Plaintiffs next assert that the statute is unconstitutional because it permits an unreasonable prior restraint without an adversary hearing. See Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). A portion of this argument is to the effect that the statute, to be valid, must specifically prescribe adversary procedures to be followed before any prior restraint is allowed. Again, we believe that such constitutional requirements are implied in the statute itself.

However, it is also argued by Grove Press that when the state district judge restrained the further showing of the film until a final determination of the cause had been made in the state court, an invalid unconstitutional *application* of the statute occurred. This is a much more difficult question.

The thrust of plaintiffs' argument is that the Supreme Court in A Quantity of Copies of Books v. State of Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1963), held that to be constitutionally sufficient, an adversary hearing must be afforded prior to ordering seizure of the material. Thus, the claim is that before Judge Walton's restraining order was granted, there should have been an adversary hearing to determine whether the film was obscene. A full hearing was held several days after the restraining order was granted, but no final decision had been reached on that issue at the time of the oral hearing in this case. Plaintiffs were in fact offered a hearing on the issue on each of three days prior to issuance of the restraining order. On each day, plaintiffs asked for a continuance in order to prepare for the hearing. Plaintiffs also requested that briefs be filed in the state proceeding which necessitated further delay.

Defendants assert, on the other hand, that A Quantity of Copies of Books v. State of Kansas, *supra*, requires only that an adversary hearing to determine obscenity *be afforded* the defendants prior to seizure or restraint. Since Grove Press could have had such a hearing before the restraining order was granted, they believe that *A Quantity of Copies of Books* has been satisfied.

We agree with this contention, although we are not unmindful of the fact that under certain circumstances, a state official could demand a hearing so soon after filing an information that a defendant could be deprived of a meaningful hearing because of insufficient time to prepare his case. Under those circumstances, we feel that the required adversary hearing could not be said to have been afforded. Such would have been the case here, for example, if, after the brief in-court proceeding on Monday, June 23, the trial court had issued its restraining order. However, plaintiff was given two more days to prepare for a hearing before the restraining order was issued. After the third request for more time by Grove Press, the trial court, pursuant to motion by the county attorney, or-

7. This is a more liberal construction than was made by that court only three years earlier in State v. A Quantity of Copies of Books, 191 Kan. 13, 379 P.2d 254 (1963).

dered on June 25, that there be no further showing of the films until final determination of the obscenity.

 We hold that when such a hearing has been *offered* to a defendant in a proceeding under K.S.A. 21–1102 et seq., and when adequate time has been allowed for a reasonable preliminary determination of obscenity, then the procedures are not constitutionally deficient for lack of safeguards to prevent suppression of non-obscene publications protected by the Constitution. See Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957).

Plaintiffs must not be heard to protest the lack of a hearing which their procrastination prevented.

Judge Walton had himself viewed the film on June 23. On that date and on the 24th, and again on the 25th, the state was ready to proceed with an evidentiary hearing. The hearing could have proceeded had it not been for Dickinson's request for delay so that its expert witnesses might view the film. Before issuing the order, Judge Walton made findings based on the evidence introduced to that point. (Transcript of Proceedings, June 25, 1969, pp. 8–12).[8] He

---

8. Judge Walton said:

"Very well, the Court will rule on it at this time. I want to make sure there is no question about the Court's ruling in event of appellate review of my decision. I feel also the appellate court should have advantage of certain findings of the Court, of course, made at this time, in support of or with reference to the decision of the Court. So at this time then the Court will proceed to rule on the motion for an interlocutory order and will make findings with reference thereto.

"First, counsel have, by stipulation, agreed that the Court view and consider the film in question as an exhibit. This has been done. And the theater of the defendant was made available and the picture was showed at a private audience.

"Secondly, the film in question was produced in Sweden with the translation into English by subtitles.

"The film purports, and I emphasize the word 'purports,' to present a young Swedish girl trying to resolve her relationships to political, social and economic problems.

"The film presents several scenes of sexual intercourse between this young girl and her lover. The scenes reveal the girl and her lover in the nude. Their genital organs are fully exhibited.

"One scene depicts actual oral-genital connection of the girl and her lover.

"Another scene exhibits a sexual orgy in a countryside rest home. The scenes here reveal violence of sexual intercourse.

"The final portion of the film reveals the act of violence of the girl as to her lover wherein she takes a knife to his genitals.

"It would appear to the Court at first blush, with reference to the request for an interlocutory order, that the dominant theme of the film taken as a whole appeals to the prurient interest in sex. The problem of the girl's relationship to social, political and economic problems appears, quote, 'secondary and to be suspect.' It would further appear the film is potentially offensive as being an affront to contemporary standards relating to the description or representations of sexual matters.

"It further appears to have utterly no redeeming social value. The Court feels that sufficient preliminary evidence has been presented on an adversary basis to permit the consideration of an interlocutory order. It must be remembered, gentlemen, that a movie is quite different from a book. The former has more of a relationship to the public. It is actually seen and is actually heard, whereas books are usually read in private. They do not present the same relation to society, while both are, of course, protected under the first and 14th amendments.

"Furthermore, movies are shown to large groups and have more of an immediate impact upon the prurient interest in sex. Intervention by the Court must be by an adversary proceeding, as brought to the Court's attention with reference to the case wherein the United States Supreme Court did reverse the Supreme Court of Kansas with reference to the specific statute that the county attorney relies on in this case. Obviously, gentlemen, before the film here could be the subject of confiscation or destruction there must be a full adversary proceeding. However, gentlemen, if the normal procedures were pursued the film would be exhibited and it would render moot for most purposes, the issue of the obscenity question before the Court if regular and normal legal procedures were utilized. Surely this was not the contemplation of the United States Supreme Court when it construed the need of an adversary pro-

concluded that "the film is potentially offensive as being an affront to contemporary standards relating to the description or representations of sexual matters," and that it "appears to have utterly no redeeming social value." We believe that the findings and conclusions supply the authoritative judicial construction required by Freedman v. Maryland, *supra*.

 Having disposed of the questions for which this court was convened, i. e., the constitutionality of the Kansas statutes, we are confronted with the problem of whether or not this court ought to decide whether the film "I Am Curious (Yellow)" is obscene. This problem is not present in Lakeside Drive In, Inc. v. Menghini, KC–2997, since the parties to that action have stipulated that the only issue to be decided in their controversy is whether the statutes are constitutional.

The parties in *Grove Press* have stipulated that the record developed in the state court would be presented to this court for consideration in this determination. In addition, the court has viewed the picture in the presence of counsel.

In Landry v. Daley, 288 F.Supp. 194 (D.Ill.1968), a three-judge court held that where it had disposed of the constitutional challenge to state court prosecutions, it could (and did), as a matter of discretion, decline to exercise its jurisdiction over remaining issues. The court recognized, upon an examination of authorities, that there are two rationale for broad three-judge jurisdiction extending beyond consideration of the constitutional questions for which the court is convened.

" * * * First, grounds other than the constitutional invalidity of a statute should be available to the three-judge court so that it may, if possible, avoid invalidating the statute. Second, where all challenges to a statute rest on the same set of facts, judicial efficiency is best served if all challenges are heard at one time by one tribunal." 288 F.Supp. 194 at 199 (D. Ill.1968), citing Hobson v. Hansen, 256 F.Supp. 18 (D.D.C.1966).

In Landry v. Daley, 288 F.Supp. 194 (D.Ill.1968), the court declined to consider remaining issues in the case and returned it to the original single district judge, saying that the facts in the case did not bring it within either of the two rationale above set out. The present case also seems ill-suited for consideration of other issues. In the first place, we have considered the Kansas statute and have reached the conclusion that it is valid on its face and as applied to Grove Press, Inc. We therefore need not rely on some other ground to avoid invalidating the state statute.

Moreover, for this court to consider the issue of the obscenity of "I Am Curious (Yellow)" would be to promote judicial inefficiency and to disregard normal recognition of comity between state and federal courts. This is because the issue of obscenity has already been before the state court. The parties fully tried the case there, and arguments and briefs were considered by Judge Walton, who found that the movie is obscene. Thus, for us to rule on the same question, con-

ceeding before seizure or other matters could be undertaken.

"The Court then concludes that the proper procedure, gentlemen, in this case, would be for the Court to exercise its broad equitable power. And the Court here feels in conscientious discharge of its duties that it almost is called upon and compelled to temporarily enjoin further exhibition of this film until this case is fully litigated. Of course, this is without any seizure or destruction under the statute. And I fail to see how this will cause

any irreparable harm to the defendant. Of course, the matters relating to the hearing itself will be gone into and the defendant will be given an opportunity to utilize all discovery available, and will have an opportunity to present all merits to the Court concerning this case. And at that time the Court can make a decision upon matters in a regular judicial course of events. So, therefore, the request for an interlocutory order is granted and sustained pending final decision of the Court on the merits of this case."

sidering the same record, and without the benefit of arguments and briefs of the parties directed to that question would be needless repetition of judicial effort, and we will therefore abstain from consideration of the issue. In so holding we decline to follow the procedure of Cambist Films, Inc. v. Tribell, 293 F.Supp. 407 (D.Ky.1968), where, in a proceeding similar to the present one, the court upheld the state statute, and went on to hold that the movie was obscene.

We have read the opinions in the one other reported case in which this film was sought to be suppressed as obscene, United States v. A Motion Picture Film, 404 F.2d 196 (2d Cir. 1968), in which the court reversed a jury determination that the film is obscene. Dissenting Judge Lumbard felt that it was rightly decided by the jury and further that a jury is best suited to make this type of determination. All the judges on the present court agree with Judge Lumbard's statement, but because we do not reach the question, we do not so hold. Instead, we dismiss both cases.