**Vernon Walker HUFFMAN, Appellant,**

v.

**UNITED STATES, Appellee.**

**Dennis Eugene PRYBA, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 23781, 23782.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 8, 1971.

Decided Oct. 7, 1971.

On Rehearing Aug. 10, 1972.

Mr. Stanley M. Dietz, Washington, D. C., for appellants.

Mr. John O'B. Clarke, Jr., Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry and Gene S. Anderson, Asst. U. S. Attys. were on the brief, for appellee.

Before BAZELON, Chief Judge, and LEVENTHAL and MacKINNON, Circuit Judges.

LEVENTHAL, Circuit Judge:

These are appeals from judgments [1] entered on convictions of several counts

---

1. Appellant Huffman was charged with one count of possessing obscene publications for sale on May 14, 1968, and one count of selling those articles on the same day. Appellants Huffman and Pryba were charged with possessing several obscene publications for sale on May 21, 1968. They were convicted as charged.

Appellant Huffman was sentenced to pay a fine of $300 and to serve a sixty day term of imprisonment, suspended on one year's probation with specific conditions. Appellant Pryba was sentenced to pay a fine of $500 and to serve a term of imprisonment of six months; the jail term was suspended upon probation for one year with specific conditions. On December 2, 1969, the District of Columbia Court of Appeals affirmed the convictions but remanded for resentencing after concluding that the conditions of probation were improper. Huffman v. United States, 259 A.2d 342 (D.C.App. 1969). The court denied appellants' petition for rehearing en banc.

relating to violation of the indecent publications statute, 22 D.C.Code § 2001.[2] Appellants contend that an adversary hearing should have been held prior to the seizure of the alleged obscene materials, and that the issue of obscenity was tried on the basis of an erroneous legal standard. We have examined these and other contentions of appellants and find no reversible error.

## A. *Evidence At Trial*

The Village Book Store is an "adult book store" located at 819-13th Street, N.W., in the District of Columbia. The store is operated by a corporation. Appellant Pryba is president. Appellant Huffman was employed as a sales clerk in the store.

On May 14, 1968, Walter G. Milam, an officer assigned to the Morals Division of the D. C. Metropolitan Police Department, purchased two magazines, "Modern Girls No. 14" and "Girl No. 5" at the bookstore. These items were in cellophane wrappers, and could not be examined on the inside before purchase. But when Officer Milam paid for them, Huffman assured him "those are real good ones that you are getting." After reviewing the two magazines and Officer Milam's affidavit, Judge Murphy of the then Court of General Sessions issued a warrant authorizing a search of the premises of the Village Book Store.[3] In executing the warrant the police seized 200 copies of various editions of "Girls" and "Modern Girls" plus 40 copies of a book, *Female Auto-erotic Practices*, and three rolls of 8 mm. film. The magazines and film were seized from a storeroom on the first floor, and most copies of the book were seized from the basement of the store. Appellant Huffman was present in the store and arrested when the warrant was executed.

The nature of the magazines will be treated in detail subsequently. It suffices here, for purposes of identifying our problems, to quote the brief description of their contents that appears in the opinion of the District of Columbia Court of Appeals (see 259 A.2d at 343–44):

"Each of the so-called magazines in question consisted of a collection of photographs of two females engaged in undressing, caressing, fondling and embracing the other. In many of the photographs the subjects were nude or wearing only certain articles of clothing, such as stockings, which served to accentuate the nakedness of the body. The postures of the subjects in many of the pictures were such as to expose and bring into focus the entire pubic area. The foregoing is not intended to be a graphic and complete description of the photographs. Rarely will a verbal description of a photograph accurately depict it. In our opinion, anyone viewing the photo-

2. "(a) (1) It shall be unlawful in the District of Columbia for a person knowingly—
 (A) to sell, deliver, distribute, or provide, or offer to agree to sell, deliver, distribute, or provide any obscene, indecent, or filthy writing, picture, sound recording, or other article or representation;
 * * * * *
 (E) to create, buy, procure, or possess any matter described in the preceding subparagraphs of this paragraph with intent to disseminate such matter in violation of this subsection;
 * * * * *
 (2) (B) For purposes of paragraph (1) of this subsection, the term 'knowingly' means having general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry of, the character and content of any article, thing, device, performance, or representation described in paragraph (1) of this subsection which is reasonably susceptible of examination."

3. The warrant authorized a search of the "entire premises 819 13th Street, N.W.," and a seizure of certain property, "namely see attached affidavit." The affidavit stated, "It is therefor [sic] requested that a search warrant be issued, authorizing the search for and seizure of the magazines 'Modern Girls' and 'Girls' as well as other magazines of a similar appearance and contents. * * *"

graphs would conclude that they were intended to and did portray homosexual activities between two females."

At trial the Government introduced testimony of a psychiatrist, Dr. John Cavanaugh, and an art critic, Mr. Frank Getlein, to show that the seized items had a dominant theme that appealed to the prurient interest, and were without redeeming social value. Dr. Cavanaugh, whose qualifications included work with deviant sexual groups, testified that the primary appeal of the magazines "would be to the prurient interests of Lesbians," but that they would also appeal "to the prurient interests of heterosexual males." Although the publications contained a statement, in three languages, that they were meant solely for "serious artists," Mr. Getlein stated that in his opinion "a five-minute scrutiny of any one issue would disabuse anybody of that notion." He said that the magazines were "sloppily put together," exhibited "no particular skill" in photographic technique, and for a number of reasons were virtually useless for the study of art. In addition, Mr. Getlein testified that the items exceeded the national community standards for the depiction of nudity in art.

Appellants called Dr. Wilbur A. Hamman, a psychiatrist, to testify on their behalf. He stated that in his opinion the magazines would not "necessarily appeal to the prurient interests of any particular group of people." He disagreed with Dr. Cavanaugh's conclusion that the items would appeal to female homosexuals on the ground that women would not generally "get a kick out of looking at pictures." The Doctor also disagreed with Dr. Cavanaugh's opinion that the pictures would appeal to the prurient interests of heterosexual males, but stated that men might buy the magazines for vicarious sexual gratification.

During the trial appellants attempted to challenge the assertion that the magazines were obscene by offering twenty-six other publications that had previously been declared non-obscene by the Supreme Court. The trial court refused to allow appellants to make this comparison to the jury but permitted appellants to ask Dr. Cavanaugh whether six of the exhibits appealed to prurient interests. Dr. Cavanaugh testified that individual magazines in this group would appeal to the prurient interests of various classes of persons, including male and female homosexuals, heterosexual males, and pedophiliacs. The trial court refused to permit appellant's psychiatric witness to testify as to whether these six exhibits exceeded contemporary national community standards, on the ground that this was not a medical fact.

On the issue of scienter, appellants offered to prove that they had advice of counsel, prior to the time that they stocked the seized items, that these items were not obscene. It appears that the counsel involved was a lawyer for the importer, and this offer was linked with an offer that these magazines had been cleared for importation into the country. On objection by the prosecutor, the judge excluded this evidence as immaterial.

The motion of Pryba for acquittal, on the ground that the Government had failed to prove he knew the items were stocked in the store, was denied.

Over appellants' objections, the trial court sent the case to the jury. He gave instructions as to the elements of the offense, including a definition of obscenity. The jury found both appellants guilty (see note 1).

B. *Issue of Requirement of Adversary Hearing Prior to Seizure*

We first consider appellants' claim that the First Amendment requires an adversary hearing on the issue of obscenity prior to the issuance of any warrant authorizing seizure of allegedly obscene publications, and that failure to hold such a hearing in this case requires reversal of their convictions. Appellants rely on Marcus v. Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961), and Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964).

In *Quantity of Books*, the Court held that a mere ex parte hearing, during which the judge scrutinized allegedly obscene publications, was an insufficient basis on which to issue a warrant for their seizure. The Court stated that "the procedures followed in issuing the warrant for the seizure of the books, and authorizing their impounding pending hearing, were constitutionally insufficient because they did not adequately safeguard against the suppression of non-obscene books." *Id*. at 208, 84 S.Ct. at 1724.

■ While some opinions have cited *Quantity of Books* as teaching broadly

"that law enforcement officers cannot seize allegedly obscene publications without a prior adversary proceeding on the issue of obscenity",[4]

we agree with the conclusion in United States v. Wild:[5]

"We do not believe *Marcus* and *Quantity of Books* can be read to proscribe the application of the ordinary methods of initiating criminal prosecution to obscenity cases * * * e. g., by seizing as incident to a lawful arrest evidentiary samples of allegedly obscene materials".[6]

We need not decide whether *Wild* was correct in upholding the warrantless seizure of publications pursuant to an arrest. It suffices that we agree with its reasoning that an *ex parte*, as opposed to adversary hearing, is a sufficient basis for an order authorizing (a) the seizure of a limited number of publications (b) for use as evidence in a criminal prosecution (as distinguished from an order entered in a civil action having the purpose of suppressing the books).

■ Accepting this general position, which has been advanced to us by appellee, we fail to see how it justifies the omission of an adversary hearing in the instant case. It is true that the publications seized were later used as evidence in a criminal prosecution and were not destroyed through court order. Yet it can hardly be said that the number of items seized was limited to those required for the preparation of the Government's case. The record reveals that all of the copies of "Girls" and "Modern Girls"—about 200 magazines in all—were taken from appellant's store. If the Government's purpose in seizing such quantities was to refute any claim by appellants that the magazines were not in their possession for purposes of sale, this end could have been accomplished simply by a temporary seizure, accompanied by an offer to release the magazines to appellants upon execution of a stipulation as to the number of copies of each edition in their store. In the absence of such an offer by the Government the seizure as made, without an adversary hearing, constituted an undue infringement on First Amendment rights, not justified by legitimate evidentiary needs.

■ However, we agree with the courts that have held the exclusionary rule inapplicable where, as here, the seizure is invalid because of the requirement of adversary hearing, since the primary right involved is the public's First Amendment right of access rather than the defendant's Fourth Amendment immunity from unreasonable search and seizure. The courts have simply required the Government to return the publications to their owners, conditioning the return on the owners' making copies of the publications available as evidence in future criminal prosecutions. *See, e. g.*, Bethview Amusement Corp. v. Cahn, 416 F.2d 410 (2d Cir. 1969); Tyrone Inc. v. Wilkinson, 410 F.2d 639 (4th Cir. 1969); Metzger v. Pearcy, *supra*.

---

4. Metzger v. Pearcy, 393 F.2d 202, 204 (7th Cir. 1968).

5. 422 F.2d 34, 38–39 (2d Cir. 1969); cert. denied, 402 U.S. 986, 91 S.Ct. 1644, 29 L.Ed.2d 152, reh. denied, 403 U.S. 940, 91 S.Ct. 2242, 29 L.Ed.2d 720 (1971).

6. See also Miller v. United States, 431 F.2d 655 (9th Cir. 1970); United States v. Fragus, 428 F.2d 1211 (5th Cir. 1970). But see United States v. Alexander, 428 F.2d 1169 (8th Cir. 1970); Cambist Films, Inc. v. Duggan, 420 F.2d 687 (3d Cir. 1969).

*But see* Goodwin v. Morris, 318 F.Supp. 1325 (N.D.Ohio 1970). Thus in United States v. Alexander, *supra*, although the Eighth Circuit held the seizure of publications invalid for failure to hold an adversary hearing, its judgment merely required return of the materials seized, with leave

> "to compel appellants to deliver, on request of the United States Attorney * * *, one copy of each of the titles described in the warrants for use in connection with any criminal prosecution initiated by the Government." 428 F.2d at 1176.

Since we see no meritorious attack on the reasonableness of the scope of the warrant or the search itself,[7] we have no basis for reversing the conviction because of the receipt of the exhibits in evidence.

### C. The Roth-Memoirs Obscenity Standard

■ In his charge to the jury, the trial judge defined obscenity along the lines set down by the Supreme Court in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) and a Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Com. of Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966)— that in order to find the magazines obscene, the jury must find (1) that to the average person the dominant theme of the publications taken as a whole appeals to a prurient interest in sex,[8] (2) that the material is patently offensive because it goes substantially beyond customary limits of candor and offends the common conscience of the community, in its standards relating to the description or representation of sexual matters, and (3) that the publication is utterly without redeeming social value.

■ Appellants contend that the *Roth-Memoirs* standard has been superseded by recent decisions of the Supreme Court, particularly Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1966), and that in order to sustain a conviction under an obscenity statute the prosecution must now show either (1) that the publications constitute hard-core pornography,[9] which the Court has char-

---

7. Appellants attack the scope of the warrant on the ground that it gave sole discretion to the police to decide what items were to be seized from the store. However, as noted in footnote 3, *supra*, the underlying affidavit was attached to the warrant, and the warrant expressly incorporated the affidavit in specifying the items to be seized. We therefore do not agree that the warrant was unduly broad in scope.

 As for the execution of the warrant, the 40 copies of *Female Autoerotic Practices* and the three rolls of film were not introduced into evidence. Assuming for discussion their seizure was invalid, this does not affect the validity of appellants' convictions. *See* Miller v. United States, *supra*.

8. The judge added that if the material is designed for a clearly defined sexual group other than the public at large, this requirement is satisfied if the dominant theme of the material appeals to the prurient interest in sex of members of that group.

9. The Supreme Court has never defined the term "hardcore pornography." The best-known definition of the phrase appears in Justice Stewart's dissent in Ginzburg v. United States, 383 U.S. 463, 499 n. 3, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966) as follows:

 " * * * Such materials include photographs, both still and motion picture, with no pretense of artistic value, graphically depicting acts of sexual intercourse including various acts of sodomy and sadism, and sometimes involving several participants in scenes of orgy-like character. They also include strips of drawings in comic-book format grossly depicting similar activities in an exaggerated fashion. There are, in addition, pamphlets and booklets, sometimes with photographic illustrations, verbally describing such activities in a bizarre manner with no attempt whatsoever to afford portrayals of character or situation and with no pretense to literary value. All of this material * * * cannot conceivably be characterized as embodying com-

acterized as "more stringent than the *Roth* standard" [10] or (2) that the publications, if not rising to the level of hard-core pornography, were either (a) sold to juveniles, (b) advertised so obtrusively as to make it impossible for an unwilling individual to avoid exposure to them, or (c) pandered in the manner described in Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966).

The contention that these elements define the limit of sound governmental interest in suppression is not without force. It has recently been adopted in the report of the San Francisco Committee on Crime. *See* 7th Report, Report on Non-Victim Crime in San Francisco, Part II, p. 56 et seq. (June 3, 1971). But we think it is addressed to the legislature's wisdom rather than to its power under the Constitution. This court may not review the wisdom of the statute, the prosecution or the verdict. Our only proper function is to assess appellants' contentions in the light of the guidelines provided by the Supreme Court.

While there are expressions in opinions that lend support, at least in some measure, to appellants' approach [11] our

reading of the Supreme Court's opinions leads us to conclude that *Redrup* has not displaced the *Roth-Memoirs* standard. The cryptic opinion in *Redrup* did not specifically discuss the significance of its notation that in the cases there involved there were no sales to juveniles, obtrusive advertising or pandering.[12] But *Redrup* goes on to consider whether the magazines and books before the Court were ineligible for First Amendment protection because of obscenity. While *Redrup* notes that the opinions of Justices Black and Douglas would extend First Amendment protection to all publications, and that the opinions of Justice Stewart would extend that protection to all except hard-core pornography (see note 9, *supra*), in the last analysis it appears that a majority of the Court were able to join in the *Redrup* judgment only because of the conclusion that reversal was required under the standards set forth in Memoirs v. Massachusetts, 383 U.S. 413, 418–19, 86 S.Ct. 975, 16 L.Ed.2d 1.[13]

■ In *Memoirs* the Court said that circumstances of advertising and sale of publications might be relevant, at least in a close case, in justifying the con-

---

munication of ideas of artistic values inviolate under the First Amendment. * * * " *Quoting from* brief for the United States.

The Report of the Commission on Obscenity and Pornography (1970) states that the "market" definition of "hard-core pornography" is "limited to photographic reproductions of sexual intercourse depicting vaginal, anal, or oral penetration." *Id.* at 18.

10. Mishkin v. New York, 383 U.S. 502, 508, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966).

11. *See* Luros v. United States, 389 F.2d 200, 205 (8th Cir. 1968); People v. Noroff, 67 Cal.2d 791, 63 Cal.Rptr. 575, 433 P.2d 479, 481 n. 6 (Sup.Ct.Calif.1967); Grant v. United States, 380 F.2d 748 (9th Cir. 1967); United States v. 4,400 Copies of Magazines, 276 F.Supp. 902 (D. Md. en banc, 1967); Olsen v. Doerfler, 165 N.W.2d 648, 664, 14 Mich.App. 428 (Ct.App.Mich.1968); Commonwealth v. Dell Publications, Inc., 233 A.2d 840, 852, 427 Pa. 189 (Sup.Ct.Pa.1967); State v. J. L. Marshall News Co., 232 N.E.2d 435,

13 Ohio Misc. 60 (Ct.Common Pleas Ohio 1967).

12. Since we conclude that the *Roth-Memoirs* standard has survived as the basic test of publications entitled to First Amendment protection, we presume that these other factors are material as permitting a criminal prosecution of individuals involved in such activities (sales to juveniles; obtrusive advertising; or pandering), even though possession or sale of the publications in the absence of such activities would be held protected under the *Roth-Memoirs* standard, by the First Amendment.

13. A question would arise whether Justice Harlan would apply to cases arising in the District of Columbia the standard he applies in regard to Federal or in regard to state prosecutions. Compare his dissent in Avansino v. New York, 388 U.S. 446, 87 S.Ct. 2093, 18 L.Ed.2d 1308 (1967) with his concurrence in Books, Inc. v. United States, 388 U.S. 449, 87 S.Ct. 2098, 18 L.Ed.2d 1311 (1967).

clusion that a prurient publication was devoid of redemptive social value and hence obscene. See 383 U.S. at 420, 86 S.Ct. at 978:

"On the premise, which we have no occasion to assess, that *Memoirs* has the requisite prurient appeal and is patently offensive, but has only a minimum of social value, the circumstances of production, sale, and publicity are relevant in determining whether or not the publication or distribution of the book is constitutionally protected. Evidence that the book was commercially exploited for the sake of prurient appeal, to the exclusion of all other values, might justify the conclusion that the book was utterly without redeeming social importance. It is not that in such a setting the social value test is relaxed so as to dispense with the requirement that a book be *utterly* devoid of social value, but rather that, as we elaborate in Ginzburg v. United States, *post,* pp. 470–473, [86 S.Ct., pp. 947–948], where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, a court could accept his evaluation at its face value."

Our view of the significance of *Redrup,* and the survival of the *Roth-Memoirs* standard, is in accordance with the opinion in Milky Way Productions, Inc. v. Leary, 305 F.Supp. 288 (S.D.N.Y. 1969). We find it persuasive that the Supreme Court affirmed this decision, albeit without opinion. New York Feed Co. v. Leary, 397 U.S. 98, 90 S.Ct. 817, 25 L.Ed.2d 78 (1970). This confirms our view that the trial court did not err in submitting the obscenity issue to the jury on the *Roth-Memoirs* standard.[14]

### D. *Determination of Obscenity*

 The case is not concluded by the fact that the liability of appellants was put to the jury on the correct standard. Since the question of obscenity is one of constitutional law, it is this court's obligation to make an independent determination on the issue whether the publications before us are obscene. Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964).

Although we have rejected appellants' contention that *Redrup* altered the express legal standard of obscenity, there is implicit in appellants' position another and more complex contention—namely that the Supreme Court has as a matter of *practice* restricted its findings of obscenity to cases of hard-core pornography, even though it has not expressly modified the terminology of *Roth-Memoirs.*

The Supreme Court has on numerous occasions reversed determinations of obscenity by state and lower Federal courts. A large percentage of these cases have been decided since *Redrup,* and take the form of *per curiam* reversals relying largely or solely on that opinion.[15]

14. *See also* United States v. Reidel, 402 U.S. 351, 357, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971):

"It is urged that there is developing sentiment that adults should have complete freedom to produce, deal in, possess, and consume whatever communicative materials may appeal to them and that the law's involvement with obscenity should be limited to those situations where children are involved or where it is necessary to prevent imposition on unwilling recipients of whatever age. The concepts involved are said to be so elusive and the laws so inherently unenforceable without extravagant expenditures of time and effort by enforcement officers and the courts that basic reassessment is not only wise but essential. This may prove to be the desirable and eventual legislative course. But if it is, the task of restructuring the obscenity laws lies with those who pass, repeal, and amend statutes and ordinances. *Roth* and like cases pose no obstacle to such developments."

15. Keney v. New York, 388 U.S. 440, 87 S.Ct. 2091, 18 L.Ed.2d 1302 (1967); Friedman v. New York, 388 U.S. 441, 87 S.Ct. 2091, 18 L.Ed.2d 1303 (1967); Ratner v. California, 388 U.S. 442, 87 S.Ct. 2092, 18 L.Ed.2d 1304 (1967); Cobert v. New York, 388 U.S. 443, 87 S.Ct. 2092, 18 L.Ed.2d 1305 (1967); Sheperd v. New York, 388 U.S. 444, 87 S.Ct. 2093, 18 L.Ed.2d 1306 (1967); Avansino v. New York, 388 U.S. 446, 87 S.Ct. 2093, 18 L.Ed.2d 1308 (1967);

These decisions are largely without opinion, and do not indicate whether or to what extent the reversals are predicated on lack of prurient appeal; or on the quite separate matter of lack of patent offensiveness exceeding contemporary notions of rudimentary decency;[16] or on the detection of some redeeming value. But we have considered that the case before us requires us to canvass these decisions, and to compare them with other decisions in which the Court has either affirmed a finding of obscenity or denied certiorari.

■ We felt required to do more than reiterate the observations of the D.C. Court of Appeals,[17] because we are aware of the many cases where courts have been satisfied that the materials before them were plainly obscene, only to learn that they had not sufficiently addressed themselves to the difficult constitutional issues. There is a tendency to dispose of cases like these with conclusory condemnations, often based on overdrawn descriptions. If we read the Supreme Court decisions aright, what is required is a factual description of contents and an analysis of what is being presented rather than what is being suggested.

■ Judges concerned with the many elements comprised in our free, democratic society must take care lest they decide these cases on the basis simply of their indignation and disgust with the kind of trash presented. The First Amendment extends to trash, if it stops short of obscenity, not because of its merit but because of the dangers to the free spirit generated by a system of censorship and authority delegated to censoring officials. As Justice Harlan observed in the opinion accompanying the judgment in Manual Enterprises v. Day, 370 U.S. 478, 490, 82 S.Ct. 1432, 8 L.Ed. 2d 639 (1962), the fact that photographs make magazines "dismally unpleasant,

Aday v. United States, 388 U.S. 447, 87 S.Ct. 2095, 18 L.Ed.2d 1309 (1967), reversing United States v. West Coast News Co., 357 F.2d 855 (6th Cir. 1966); Books, Inc. v. United States, 388 U.S. 449, 87 S.Ct. 2098, 18 L.Ed.2d 1311 (1967); reversing 358 F.2d 935 (1st Cir. 1966); A Quantity of Copies of Books v. Kansas, 388 U.S. 452, 87 S.Ct. 2104, 18 L.Ed.2d 1314 (1967), reversing State ex rel. Londerholm v. A Quantity of Copies of Books, 197 Kan. 306, 416 P.2d 703 (1966); Mazes v. Ohio, 388 U.S. 453, 87 S.Ct. 2105, 18 L.Ed.2d 1315 (1967), reversing 7 Ohio St.2d 136, 218 N.E.2d 725 (1966); Schackman v. California, 388 U.S. 454, 87 S.Ct. 2107, 18 L.Ed.2d 1316 (1967); Potomac News Co. v. United States, 389 U.S. 47, 88 S.Ct. 233, 19 L.Ed.2d 46 (1967), reversing United States v. 56 Cartons Containing 19,500 Copies of a Magazine Entitled "Hellenic Sun," 373 F.2d 635 (4th Cir. 1967); Conner v. City of Hammond, 389 U.S. 48, 88 S.Ct. 234, 19 L.Ed.2d 47 (1967); Central Magazine Sales, Ltd. v. United States, 389 U.S. 50, 88 S.Ct. 235, 19 L.Ed.2d 49 reversing United States v. 392 Copies of Magazine Entitled "Exclusive," 373 F.2d 633 (4th Cir. 1967); Chance v. California, 389 U.S. 89, 88 S.Ct. 253, 19 L.Ed. 2d 256 (1967); I. M. Amusement Corp. v. Ohio, 389 U.S. 573, 88 S.Ct. 690, 19 L.Ed.2d 776 (1968), reversing 10 Ohio App.2d 153, 226 N.E.2d 567 (1966); Robert-Arthur Management Corp. v. Tennessee ex rel. Canale, 389 U.S. 578, 88 S.Ct. 691, 19 L.Ed.2d 777 (1968), reversing 220 Tenn. 101, 414 S.W.2d 638 (1967); Felton v. City of Pensacola, 390 U.S. 340, 88 S.Ct. 1098, 19 L.Ed.2d 220 (1968), reversing 200 So.2d 842 (Fla.App. 1967); Henry v. Louisiana, 392 U.S. 655, 88 S.Ct. 2274, 20 L.Ed.2d 1343 (1968), reversing 250 La. 682, 198 So.2d 889 (1967); Carlos v. New York, 396 U.S. 119, 90 S.Ct. 395, 24 L.Ed.2d 303 (1969); Cain v. Kentucky, 397 U.S. 319, 90 S.Ct. 1110, 25 L.Ed.2d 334 (1970), reversing 437 S.W.2d 769 (Ky.1969); Bloss v. Dykema, 398 U.S. 278, 90 S.Ct. 1727, 26 L.Ed.2d 230 (1970), reversing 17 Mich. App. 318, 169 N.W.2d 367 (1969); Walker v. Ohio, 398 U.S. 434, 90 S.Ct. 1884, 26 L.Ed.2d 385 (1970); Hoyt v. Minnesota, 399 U.S. 524, 90 S.Ct. 2241, 26 L.Ed.2d 782 (1970), reversing 286 Minn. 92, 174 N.W.2d 700 (1970).

16. Manual Enterprises v. Day, 370 U.S. 478, 481–491, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962).

17. The Government's brief does little more than say (p. 15): "The entire array of photographs are devoted to the portrayal of sex scenes. Even to suggest that they serve any other purpose stretches credulity to the breaking point."

uncouth and tawdry \* \* \* is not enough to make them 'obscene'." And it is not immaterial, though it is not decisive, that there is no claim that appellants pandered, or distributed to the young, or flaunted their wares on the public.[18]

Application of the obscenity standard involves a subjective element on the part of the tribunal—judge, jury or both—making the critical determination. With regard to the constitutional limits of this standard, however, our analysis of Supreme Court decisions makes possible some relevant conclusions for a working approach that aids us in our task in this case.

*Texts*

▮ It appears that the Court extends broad First Amendment protection to the portrayal of sexual activity in textual form. Thus the Supreme Court has reversed findings of obscenity with respect to, *e. g., Fanny Hill;*[19] *Tropic of Cancer*[20] and a number of books featuring repeated sexual episodes.[21] The

Court's tolerance also extends to accounts of homosexual activities.[22]

▮ However, in Mishkin v. New York, 383 U.S. 502, 86 S.Ct. 958, 16 L. Ed.2d 56 (1966) the Court affirmed convictions under the New York obscenity law, based on publication of books most of which "depict such deviations as sado-masochism, fetishism, and homosexuality. Many have covers with drawings of scantily clad women being whipped, beaten, tortured, or abused."[23] The Court did not base its obscenity determination on prurient appeal to the average person; indeed it concluded the material would disgust and sicken the "average person". What the Court held was that prurient appeal to deviant groups would satisfy "the prurient-appeal requirement of the *Roth* test \* \* \* if the dominant theme of the material taken as a whole appeals to the prurient interest in sex of the members of that group."[24]

*Films*

▮ In the cases involving films, the Court has refused to find obscenity in

---

18. The record shows that a sign on the door and adjoining window indicated this was a store only for adults. The trial judge himself asked Officer Milam, and with good reason, who was in the store when he made his purchase, and the answer was "four or five other customers," all males, two "about my age [32]" and the others in their fifties (Tr. 28).

19. Memoirs v. Massachusetts, *supra.*

20. Grove Press, Inc. v. Gerstein, 378 U.S. 577, 84 S.Ct. 1909, 12 L.Ed.2d 1035 (1964), reversing 156 So.2d 537 (Dist.Ct. App.Fla.1963).

21. *E. g., Sex Life of a Cop,* a novel dealing with the sexual escapades of a police sergeant and his fellow officers, moving "without palliating interruption \* \* \* from one sexual enterprise to another;" Aday v. United States, *supra* (Quotation from lower court opinion).
 *Lust Job,* "a tale exclusively devoted to the sexual adventures of its principal characters. Adulteries, seductions, and orgies are the only events of importance." Books, Inc. v. United States, *supra* (Quotation from lower court opinion).
 A number of novels described as relating "repeated accounts of lewd and degrading

episodes;" Hoyt v. Minnesota, *supra* (Quotation from lower court opinion).
 *Orgy Club*—a novel featuring repeated sexual episodes. Mazes v. Ohio, *supra.*

22. One, Inc. v. Olesen, 355 U.S. 371, 78 S.Ct. 364, 2 L.Ed.2d 352 (1958), reversing 241 F.2d 772 (9th Cir. 1957) ; A Quantity of Copies of Books v. Kansas, *supra.* The Court has very recently overturned a finding of obscenity with respect to *Lesbian Roommates,* a paperback book containing descriptions of hetrosexual and homosexual acts on the average of once every ten pages, and whose cover bore the drawing of two partially nude females, and the caption, "They slashed each other with the savagery of perverted desires. 'Beat me !' she cried." Childs v. Oregon, 401 U.S. 1006, 91 S.Ct. 1248, 28 L.Ed.2d 542 (1971), reversing 431 F.2d 272 (9th Cir. 1970). This was a habeas corpus proceeding. The Court had denied certiorari in the original criminal proceeding involving the same book. State v. Childs, Or., 447 P.2d 304 (1968), cert. denied, 394 U.S. 931, 89 S.Ct. 1198, 22 L.Ed.2d 460 (1969).

23. 383 U.S. at 505, 86 S.Ct. at 961.

24. *Id.* at 508, 86 S.Ct. at 963.

films if the complaint relates to instances involving mere suggestion of sexual activity,[25] or to a sexual episode which, though explicit, was "so fragmentary and fleeting that only a censor's alert would make an audience conscious that something 'questionable' is being portrayed." [26]

In I & M Amusements v. Ohio, 389 U.S. 573, 88 S.Ct. 690, 19 L.Ed.2d 776 (1968),[27] the Court reversed a criminal conviction based on the exhibition of a film featuring "pinups" [28] and a series of scenes in which two women "at least nude to the waist" were "going through actions" which the trial judge said "could lead to no conclusion * * * except that they were behaving like lesbians." This description clearly states the judge's abhorrence and almost as clearly reveals the lack of explicit sexual activity.[29]

The Court has also reversed a state criminal conviction based on the film, *I, A Woman*.[30] Although the state court referred to the film as "vividly" portraying the sexual encounters of the heroine, its detailed findings reveal that there was no explicit sexual activity, the most extreme explicit activity being, apparently, the man's caressing her stomach with kisses.[31]

Convictions have been left standing where films have portrayed explicit "sexual activity"—a term used here to cover both sexual intercourse and deviant activities that produce the kind of sexual gratification derived by deviant personalities. Thus the Supreme Court has affirmed, 5–4, a finding of obscenity with respect to the film, *Chant D'Amour*.[32] This film, written and directed by Jean Genet, dealt with relations among prisoners, and between prisoners and a guard, at an unnamed prison cell in an unnamed place. Presumably the element of possibly redeeming social value entered into some of the dissenting votes, while the affirmance took into account the fact, as found by the state court, that the film "explicitly and vividly revealed acts of masturbation, oral copulation, the infamous crime against nature (sodo-

25. Times Film Corp. v. Chicago, 355 U.S. 35, 78 S.Ct. 115, 2 L.Ed.2d 72 (1957), reversing 244 F.2d 432 (7th Cir. 1957) —*Game of Love*, sole instance of nudity was back view of naked boy running along beach; seduction by an older woman suggested, but in no way pictured.

26. Jacobellis v. Ohio, 378 U.S. 184, 197–98, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Goldberg, J., concurring).

27. Reversing 10 Ohio App.2d 153, 226 N.E. 2d 567 (1966).

28. Defined by the state court as a "convention of undress which excludes any dress other than a covering in the lower regions of some standard form."

29. *Id.* at 569.

30. Cain v. Commonwealth, 397 U.S. 319, 90 S.Ct. 1110, 25 L.Ed.2d 1343 (1970), reversing 437 S.W.2d 769 (Ct.App.Ky.1969).

31. 437 S.W.2d at 774–775:
The film is a 90-minute motion picture devoted almost entirely to the sexual encounters of one female by the name of Eve. It opens by showing Eve nude in her bedchamber engaged in the practice of caressing herself in a suggestive manner to the accompaniment of her father's violin. She progresses to a passionate love scene with her fiance, Svend, while lying fully clothed on top of him in her bedchamber. This act is performed with the camera full on the subject. From this the film proceeds to the act of intercourse with a married patient, Heinz Goertzen, in a hospital room where Eve is employed as a nurse. This act she solicits with the use of nude photographs taken of her by her fiance for this specific purpose. During the course of the sequence, the camera focuses upon the head of the male partner and the stomach area of the female partner. It shows the male partner caressing with kisses the area between the navel and the pubic hair. The camera then shifts during the act of intercourse to the face of the female subject. After this, the film follows the life of Eve from one act of sexual intercourse to another until it has been accomplished some five times, all with different partners. Each time the act is as vividly portrayed upon the screen as was the scene in the hospital room. In one instance the sex act is in the form of rape.

32. Landau v. Fording, 388 U.S. 456, 87 S.Ct. 2109, 18 L.Ed.2d 1317 (1967), affirming, 245 Cal.App.2d 820, 54 Cal.Rptr. 177 (Dist.Ct.App.Calif.1966).

my), voyeurism, nudity, sadism, masochism and sex. * * * [33]

*Still Photographs and Photographic Publications*

We turn now to the Supreme Court's practice with respect to materials most relevant to the case at hand—still photographs and publications mainly photographic in content.

The Supreme Court has consistently refused to sustain findings of obscenity based solely on representations of nudity by photograph. *Redrup* itself involved the magazines *Gent, Swank, Sir,* and others of their kind, containing photographs of women nude from the waist up (plus short stories concerning various sexual episodes).[34]

■ The mere exposure of genitalia is not sufficient to justify finding a photograph obscene. Thus the Court has on several occasions extended First Amendment protection to so-called nudist magazines, featuring pictures of men, women, and children engaged in daily activities at nudist colonies.[35] The Court has also reversed judgments prohibiting the importation of *Hellenic Sun* and similar magazines, featuring photographs of nude males posed in the out-of-doors, even though the models were not engaged in outdoor activity, and their genitals are made the focal points of the pictures.[36]

As for female nudity, the Supreme Court has reversed judgments holding the magazines *Cover Girl, Exciting,* and *Exclusive* obscene.[37] The Court of Appeals for the Fourth Circuit described *Exclusive* as follows:[38]

> *Exclusive* is a collection of photographs of young women. In most of them, long stockings and garter belts are employed to frame the pubic area and to focus attention upon it. A suggestion of masochism is sought by the

---

33. 54 Cal.Rptr. at 178, 245 Cal.App.2d at 822.

We attach no precedential weight to the 4–4 vote in Grove Press v. Maryland State Board of Censors, 401 U.S. 480, 91 S.Ct. 966, 28 L.Ed.2d 205 (1971) (Douglas, J., not participating), affirming Wagonheim v. Maryland State Board of Censors, 255 Md. 297, 258 A.2d 240 (Ct.App. Md.1969), declaring "I am Curious (Yellow)" obscene. The state court said (258 A.2d at 242):

"Actually, the film vividly depicts six different acts of sexual intercourse in various positions and locales. Among the more unusual scenes is an episode of copulation in the crook of a tree; a second occurs on the balustrade of the royal palace in Stockholm in rhythm to the Swedish national anthem, while a distraught sentry endeavors to stand at attention as he views the efforts of the two out of the corner of his eye. This is considered to be one of the humorous episodes of the film. There are a number of scenes depicting complete nudity of the male and female leads, including numerous views of both the female and male genitals. There are representations of fellatio and cunnilingus, as well as the suggestion of sodomy in one of the intercourse scenes, and of castration in the fantasy scene."

34. 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed. 2d 515 (1967), reversing Gent v. State, 239 Ark. 474, 393 S.W.2d 219 (1965). In Ginsberg v. New York, 390 U.S. 629, 634 n. 3, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), the Court indicated that the same type of magazines were involved in Conner v. City of Hammond, Avansino v. New York, Sheperd v. New York, Friedman v. New York, Keney v. New York, cited in note 15, *supra.*

35. See, *e. g.,* Sunshine Book Co. v. Summerfield, 355 U.S. 372, 78 S.Ct. 365, 2 L.Ed.2d 352 (1958) reversing 249 F.2d 114 (D.C.Cir.1957); Felton v. City of Pensacola, 390 U.S. 340, 88 S.Ct. 1098, 19 L.Ed.2d 1220 (1968), reversing 200 So.2d 842 (Dist.Ct.App.Fla.1967).

36. Potomac News Co. v. United States, 389 U.S. 47, 88 S.Ct. 233, 19 L.Ed.2d 46 (1967), reversing 373 F.2d 635 (4th Cir. 1967); Central Magazine Sales, Ltd. v. United States, 389 U.S. 50, 88 S.Ct. 235, 19 L.Ed.2d 49, reversing 373 F.2d 633 (4th Cir.1967). *See also* Manual Enterprises v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962).

37. Central Magazine Sales, Ltd. v. United States, *supra;* Bloss v. Dykema, 398 U.S. 278, 90 S.Ct. 1727, 26 L.Ed.2d 230 (1970), reversing 17 Mich.App. 318, 169 N.W.2d 367 (Mich.1969).

38. *Central Magazine Sales, supra,* at 634.

use in many of the pictures of chains binding the model's wrists and ankles. Some of the seated models, squarely facing the camera, have their knees and legs widespread in order to reveal the genital area in its entirety. In one of the pictures, all of these things are combined: The model, clad only in a framing black garter belt and black stockings is chained to a chair upon which she is seated, facing the camera, with one knee elevated and both spread wide.

*Cover Girl* and *Exclusive* were described in a similar vein in the opinion of the Michigan Court of Appeals.[39] These reversals by the Supreme Court prompted the following comment by the Court of Appeals for the First Circuit, in a case also involving *Cover Girl* and *Exciting*:[40]

> [W]e are obliged to conclude that no photograph of the female anatomy, no matter how posed if no sexual activity is being engaged in, or however lacking in social value, can be held obscene.

On the other hand, the Court has refused to upset findings of obscenity in cases of photographs depicting overt sexual activity. Thus in Phelper v. Texas, 382 U.S. 943, 86 S.Ct. 387, 15 L.Ed.2d 353 (1965), the Court denied certiorari to a conviction for possessing obscene photographs. Many of the photographs were "of men and women in the nude. Some of the pictures showed the parties

engaged in the act of sexual intercourse and other unnatural sex acts."[41]

In Levin v. Maryland, 389 U.S. 1048, 88 S.Ct. 767, 19 L.Ed.2d 840 (1968), the Court again denied certiorari on a conviction for illegal sale of obscene photographs, where each of the offending photographs depicted a man's "large penis in full erection."[42] This disposition is of particular significance—even though normally denial of certiorari is said to import no view as to the merits. While the various publications of nude female photographs might have been said to excite some prurient interest there is no representation of sexual activity. In the case of the nude male, photographs that show a full erection[43] may fairly be referred to as presenting the kind of sexual response that typically denotes imminent sexual activity.

Finally, we take note of G. I. Distributors, Inc. v. New York, 389 U.S. 905, 88 S.Ct. 218, 19 L.Ed.2d 219 (1967), where the Court refused to review a conviction under the New York obscenity statute, based on a pamphlet containing some 70 full-page color photographs each of which depicted two or more young men engaged in activity described by the state court as follows:[44]

> "All of the photographs are of two or more young men, and in nearly all, in various stages of undress or nudity, engaged in attitudes of embracing, wrestling, spanking, beating, or en-

39. 169 N.W.2d at 373.

40. Hunt v. Keriakos, 428 F.2d 606, 608 (1st Cir. 1970) cert. denied, 400 U.S. 929, 91 S.Ct. 185, 27 L.Ed.2d 189.

41. Phelper v. Texas, 396 S.W.2d 396, 398 (Ct.Crim.App.Tex.1965).

42. 1 Md.App. 139, 228 A.2d 487, 488 (1967) :
 "[T]he photographs in evidence are of one type, each being of a young man, two being completely naked, the third wearing only an undershirt. Each man is distinguished by a large penis in full erection. In one photograph, the subject, in profile, is fondling his penis, in another the subject, in profile, is reclining on his back and in the third

the subject is standing full face to the camera."

43. And thus go beyond the photographs discussed in Manual Enterprises v. Day, note 36, *supra* (pictures "suggested what appeared to be a semi-erect penis", 370 U. S. at 490, n. 13, 82 S.Ct. at 1438) ; or in Potomac News Co. v. United States, *supra* note 36 ("if the general pose of each model be languid, the penis in some of the pictures appears not in complete repose," 373 F.2d at 640).

44. See People v. G. I. Distributors, Inc., 20 N.Y.2d 104, 228 N.E.2d 787, 789 (Ct. App.N.Y.1967). In his dissent Chief Justice Fuld refers to these descriptions as "overdrawn," and the pictures as no more than "suggestive."

forced disrobing of one of the young men. In some of the pictures, the ones indeed which are most violative of the statute, one of the young men is hardly more than a boy. Where genitalia would be exposed the area is rendered opaque by retouching. A few of the captions are suggestive.

Two of the photographs portray one young man manually soap-lathering the genitalia of the other. One portrays a young man trying to seize the genitalia of another. Two portray the young men in embracive posture consonant with and suggestive of an act of pederasty. There are three nude spanking scenes. There are several others depicting sadistic assaults. The disrobing and wrestling scenes are strongly suggestive of activity directed toward exposure or seizure of genitalia."

*Analysis*

To avoid comparing horses and apples we may put to one side the cases providing considerable protection in the case of texts,—possibly because the plot or narrative may have some redeeming social value.

■ As to photographs, moving or still, mere nudity is not obscene, but depiction of sexual acts is obscene. The First Amendment protection for the depiction of nude women applies even to "girly" magazines like *Exciting, Cover Girl,* and *Exclusive,* where the pictures focus upon the pubic areas and poses are struck in such a way as to emphasize the female genitalia.

However, the determination of obscenity is not limited to photographs of sexual acts in the conventional sense, as in *Phelper.* It was applied in *Levin* to photographs of single males shown in a state of erection. It was applied in *G. I. Distributors* to photographs of two or more males, in undress or nudity, shown in activity as noted above—embracing; wrestling; disrobing; soap-lathering of, and efforts to seize, another's genitalia —and "embracive postures consonant with and suggestive of an act of peder-

asty." These factors put the photographs over the line, as compared with the pictures of two or more nude men, posed in the out-of-doors, which have been protected (see note 36), notwithstanding partial erections (note 43) and a lens focus on genitalia.

*Magazines In This Case*

We turn to the magazines at hand, and consider them in more detail. Each of them consists of a collection of photographs of two females shown undressing, caressing, fondling, and embracing each other. Typically the models are entirely nude, or wear stockings and garter belt tending to frame and accentuate the pubic area. There is some spare text in Danish, and, in some of the magazines, a trilingual statement purportedly addressed to "serious students" of art.

■ Magazines of this particular genre appear not to have been passed on directly by the Supreme Court. The Court's extension of First Amendment protection to "girly" magazines like *Exciting* and *Exclusive* is not determinative, for they are what is known in the trade as "singles", featuring individual female models. Pictures of two or more models, apparently known in the trade as "duals", are more likely to represent "sexual activity", either in progress or imminent, and must be evaluated independently.

Many of the photographs before us may fairly be characterized as portraying models who are sufficently close to the point of "sexual activity" to warrant the judgment that the First Amendment does not prohibit an obscenity determination made under the *Roth-Memoirs* standard—in view of the kind of judgment implicit in the cases involving the film *Chant D'Amour* and the photos involved in *Levin* and *G. I. Distributors.*

While detail is distasteful in such matters, it can hardly be avoided. And so we note that in Government Exhibit 2, the magazine that Officer Milam purchased, the ladies are nude except for stockings, are in a series of small photographs shown on rear and front cover, with their

bodies in close embrace, and the promise of these photographs is extended inside with such photographs as these: one lady either kissing or about to kiss the pubic area of the other; the ladies embracing while one's breast snuggles into the other's body, sometimes front, sometimes rear; their lips about to kiss either while one's breast rests on the other's stomach, or, another time, while the ladies are kneeling, one stomach against another, one's hand caressing the other's buttock.

The other issues of the magazine differ in particulars, but not in overall portrayal. Thus in Government Exhibit 10, one sequence of photographs shows a model untying the bikini panties worn by her companion and then passing them between the latter's legs after removing them. The magazines abound with other photographs involving mutual undressing, sometimes while one is fondling her companion's breast. Numerous pictures show the ladies nude, a term used here to include e. g., the "virtually nude" ladies clad only in stockings, while embracing and kissing each other, with one or both in a kneeling or sitting position, and hands placed near, and sometimes on, each other's breasts. The ladies are frequently shown lying together on bed or couch, embracing and occasionally fondling each other's breasts. Government Exhibit 9 contains photographs of one nude lady on top of the other, with their pubic areas about to touch.

The photographs contained in these exhibits represent explicit portrayal of lesbian sexual activity, either ongoing or imminent, that bring them within the decisions refusing to upset obscenity convictions on First Amendment grounds.

■ We conclude that the materials before us are such that there is no constitutional impediment to an obscenity determination made by a jury (or judge) applying the standards of *Roth-Memoirs*. Taking into account the testimony given at trial, and perusal of these magazines, we conclude that their dominant appeal is to the prurient interest, and that they exceed contemporary community standards. *Cf*. Kaplan v. United States, 277 A.2d 477 (D.C.Ct.App.1971). Appellants have not suggested, either in this court or below, any possible social value except for the study of art. We do not rest on our own untutored view for the conclusion that the legend on artistic purpose seems insubstantial, if not a sham. It was also presented in the testimony of Mr. Getlein, an expert witness qualified, by experience and study in the world of art, to offer a responsible viewpoint as to serious artistic purpose or standing. Appellants offered no contrary testimony on this issue. We affirm the finding that these materials are obscene.

### E. *Trial Court Rulings*

1. Appellants, especially appellant Pryba, assert that the trial court erred in failing to grant their motions for judgment of acquittal, on the ground that the Government had failed to prove the element of scienter. Those motions were denied, as was appellants' attempt to show that their attorney had advised them that the materials involved were not obscene. These contentions lack merit.

■ Criminal liability for the sale of obscene materials requires a showing of the seller's knowledge of the content of those materials. Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959). However, the District of Columbia obscenity statute punishes only activities "knowingly" engaged in, and defines "knowingly," as (22 D.C.Code § 2001(a) (2) (B)):

> "having general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry of, the character and content of any article, thing, device, performance, or representation described in paragraph (1) of this subsection which is reasonably susceptible of examination."

These terms are similar to those approved by the Supreme Court in Mishkin v. New York, *supra*.

Appellants do not challenge the validity of this section, which served as the

basis for the trial court's instruction to the jury, but rather contest the sufficiency of the evidence.

 The court excluded an offer of evidence regarding advice received by appellants from their attorney. We find no abuse of discretion. The statute does not require that the defendant have legal knowledge that the magazine's contents permit an obscenity finding consistent with pertinent rules of law, including constitutional doctrine. The statute and the *Smith-Mishkin* rule, only require awareness of the contents of those materials. Inference of that kind of factual knowledge is not negatived by the lawyer's advice.

There is no lack of evidence of pertinent knowledge. Huffman was employed as a salesman in the store, presumably had contact with the materials on a day-to-day basis, and told Officer Milam, at the time of the purchase, that he was getting "real good ones." Pryba was president of Village Book Stores, Inc., and had been seen working in the store during November, 1967, and on two or three other occasions. His name appeared on the corporation's certificate of occupancy. It also appeared on the company's application for a license to operate a vending machine in the store, and an official of the D. C.'s Department of License and Inspection testified that this is required to be filed annually "by a member running the establishment."

 The D. C. obscenity statute (*supra*, note 2) provides criminal sanctions only against one who "knowingly" possesses obscene materials for sale. The term "knowingly" is defined as meaning "having general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry, of the character and content" of the publication involved. This definition avoids the vice of liability without fault condemned in Smith v. California, *supra*. The Government is not required to meet the impossible burden of showing subjective or detailed knowledge of contents. As Justice Brennan stated in Smith v. California, *supra*, "Eyewitness testimony of a bookseller's perusal of a book hardly need be a necessary element in proving his awareness of its contents." 361 U.S. at 154, 80 S.Ct. at 219. To the extent that the statute imposes an affirmative duty on the owner to inquire further when once put on general notice of the character of the publication it is not inconsistent with prevailing conceptions of fault applicable to those engaged in running an enterprise seeking public custom. *See* Am-Chi Restaurant, Inc. v. Simonson, 130 U.S.App.D.C. 37, 396 F.2d 686 (1968). This is not a case of a passive, absentee or nominal official of the firm. Pryba was not an "absentee landlord," but a participant, at least on occasion, in the day-to-day affairs of Village Book Stores, and one who put himself forward as a responsible official running the establishment. He did not take the stand to offer a credible explanation that he did not know and had no reason to know the general character of the magazine. On this record, the jury was free to impute to him some knowledge of the nature of his trade, and an awareness that at least some of the publications carried by the store bordered on the obscene. There was evidence to support the verdict.

 2. Appellants sought to introduce copies of 26 magazines that had previously been declared non-obscene by the Supreme Court, asking to bring these before the jury as evidence of contemporary community standards. The trial court, finding the exhibits immaterial, refused to permit the comparison to be made before the jury. We affirm.

The magazines offered by appellants were those involved in the *Central Magazine* and *Potomac News* cases, *supra*. These magazines—*Exciting, Cover Girl, Hellenic Sun*, and others—fall within the category of "singles". As discussed above, this type of magazine is clearly distinguishable from the genre involved here. We do not say that decisions involving other publications can play no part in the evaluation of a particular magazine or book. Certainly a judge

passing on the legal "obscenity" of material before him will consider whether it is so close to others already passed on by the courts as to require a judicial ruling on obscenity without submission to the jury. Once the judge declines to dismiss the prosecution on legal grounds we think it becomes a matter of sound discretion, that takes into account relatedness and remoteness, whether it is more likely to be helpful or confusing for the jury to make comparisons with publications passed on in previous cases. In view of the important distinctions between the "duals" photographs in the magazines on trial and the singles in previous cases, we hold the judge did not abuse his discretion in ruling against appellants on this issue. Womack v. United States, 111 U.S.App.D.C. 8, 10, 294 F.2d 204, 206, cert. denied, 365 U.S. 859, 81 S.Ct. 826, 5 L.Ed.2d 822 (1961).

Appellants contend that various procedural rulings culminated in the denial of a fair trial. No abuse of discretion has been shown.

Affirmed.

On Petitions for Rehearing

PER CURIAM:

■ In original and supplemental petitions for rehearing appellants have urged us to reconsider, in light of Burgin v. South Carolina, 404 U.S. 806, 92 S.Ct. 46, 30 L.Ed.2d 39 (1971) and Wiener and Dulin v. California, 404 U.S. 988, 92 S.Ct. 534, 30 L.Ed.2d 539 (1971), our ruling of October 7, 1971.[1] We stated the view that in addition to hard-core pornography, there was photographic material that was not constitutionally protected, if there were (a) expert testimony that the material satisfies the tripartite *Roth-Memoirs* formulation [2] and (b) in the case of "duals"—pictures of two or more models—photographs portraying ongoing or imminent sexual activity.

Appellants point to *Burgin* and to *Wiener and Dulin* as confirming their submission to us that, in the cases involving photographs, what the Supreme Court has been doing in fact is applying a *Redrup* rule,[3] that except for hardcore pornography, the obscenity exception to the First Amendment is not applicable unless the magazines are (a) sold to juveniles, or (b) advertised in such wise as to expose unwilling adults to the material, or (c) pandered.

In our opinion we noted (152 U.S. App.D.C. at —— ——, 470 F.2d at 394–395), that this possibility had force, and was supported by expressions in other judicial opinions.[4] We concluded, however, particularly in view of the passage in United States v. Reidel, 402 U.S. 351, 357, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971), that the *Roth-Memoirs* standard still survived for material other than hard-core pornography, and we undertook to state an analysis consistent with this approach, notwithstanding the difficulties presented by the cryptic pronouncements of the Supreme Court, and the uncertainties inherent in reliance on orders, denying certiorari, entered without explanation.

■ We are now confronted with the fact that in *Burgin* and in *Wiener and Dulin,* the petitioners based their appeal to the Supreme Court in significant measure on a construction of *Redrup* like that advanced to us by appellants. The Supreme Court's reversals,

---

1. 152 U.S.App.D.C. ——, 470 F.2d 386.

2. That it is utterly without redeeming social value, appeals to a prurient interest in sex, and is patently offensive in light of community standards. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L. Ed.2d 1498 (1957); and Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966).

3. Redrup v. United States, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967).

4. See our 152 U.S.App.D.C. at pp. —— — ——, 470 F.2d at pp. 394–395, and cases cited in fn. 11, particularly United States v. 4,400 Copies of Magazines 276 F.Supp. 902 (D.Md. en banc 1967) (arising under 19 U.S.C.D. § 1305). *Compare* Hayse v. Van Hoomissen, 321 F.Supp. 642 (D. C.Or.1970).

citing *Redrup*, did not necessarily accept those contentions. But they gave no other indication why the judgments were reversed by the Supreme Court. The *Burgin* reversal was susceptible of explanation on the basis of the state's position, identified in the state supreme court's opinion,[5] that photographs of single females focusing on genitalia are obscene; that this view is constitutionally inadequate is noted in our prior opinion (152 U.S.App.D.C. at ——, 470 F.2d at 401).[6] However, in *Wiener and Dulin* the exhibits were not photographs of single nudes but involved at least "simulated sexual activity."[7] This left us groping for a possible basis for the Supreme Court's opinion,[8] if *Redrup* were limited in the way we had supposed, and for possible reconciliation with our prior opinion.

On June 26, 1972, as one of its final actions of the term, the Supreme Court ordered reargument in various cases involving obscenity issues that had already been argued. It also granted certiorari in other obscenity cases. In Alexander v. Virginia, 408 U.S. 921, 92 S.Ct. 2490, 33 L.Ed.2d 332 the Supreme Court requested the parties to brief and argue, in addition to the questions presented in the petition for certiorari, the following question:

> Whether the display of any sexually oriented pictorial magazines for

commercial sale, when surrounded by notice to the public of their nature and by reasonable protection against exposure of the magazines to juveniles, is constitutionally protected?

■ If we understand this aright, it appears that the Court will be reconsidering the passage in United States v. Reidel, 402 U.S. 351, 357, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971), relied on in our former opinion,—that under *Roth* the Constitution leaves it to the legislature to determine whether the law's involvement with obscenity should be limited to situations involving children or imposition on unwilling recipients.

Secondarily, the Court may come to consider whether, in the absence of juveniles or unwilling adults, the obscenity that may be constitutionally prohibited is limited to hard-core pornography, whether—in the words of *Redrup*—a "not dissimilar standard" is the consequence of superimposing on the "prurient" test of *Roth* the "patent offensiveness" test articulated in Manual Enterprises, Inc. v. Day, 370 U.S. 478, 482, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962).

Further, even assuming that the Court would not hold the States limited to hard-core pornography it might hold the Federal statutes so limited, for the reasons stated by Justice Harlan, in *Roth, supra*, 354 U.S. at 496, 77 S.Ct. 1304. (Harlan, J., concurring in part, dissent-

---

5. State v. Burgin, 255 S.C. 237, 178 S.E. 2d 325 (1970).

6. This approach would clearly account for Hartstein v. Missouri, 404 U.S. 988, 92 S.Ct. 531, 30 L.Ed.2d 539 (1971), where the Court, citing Redrup, summarily reversed a conviction, 469 S.W.2d 329 (Mo. 1971), based on the film "Night of Lust," which the state court deemed obscene because of close-up portrayals of "gyrating naked breasts" and "nude body gyrations and undulations," which led the court to conclude that "the motion picture *suggests* promiscuous sexual intercourse and homosexual activity which is totally unrelated to any plot." (emphasis added)

7. See Petition for Rehearing of Order on Petition for Certiorari, p. 8, opposing the claim of petitioner "that simulated sexual activity is not obscene."

8. Conceivably the simulation was so obvious that it palpably lacked prurience. But magazine photographs, as contrasted with movies, are likely to represent simulated activity. The possibility that the reversals in *Wiener, Dulin* and *Hartstein* were based in part on the problem that the activity depicted was recognizably "simulated" would be congruent with a definition of obscenity, for cases not involving children and unwilling recipients, applicable only in cases of "hard-core pornography, *see* note 9 in our previous opinion.

We might also speculate that the difficulty with the state court's action was that it failed to set forth explicitly what was deemed to be the offensive material. But there is no opinion delineating such a requirement.

ing in part). Compare United States v. 4,400 Copies of Magazines, *supra*, note 4. If so, there would be at least a question whether the content of "obscene" is different when used by Congress in 22 D.C. Code § 2001.

The case before us is at the crux of the issues. There is no hard-core pornography.[9] There is no claim that appellants engaged in offers or sales to juveniles. As noted in our prior opinion (note 18) the sign on the door and window indicated this bookstore was only for adults, and the only customers in the store at the time of the police officer's purchase were two men in their 30's and two or three in their 50's. There was no advertising or merchandising that exposed unconsenting adults to the material the Government deems objectionable.

At this juncture of jurisprudence, we think it appropriate to grant the petitions for rehearing, to the extent of deferring the issuance of our mandate in this case, and to await guidance from the Supreme Court in Alexander v. Virginia and the other cases scheduled for reargument.

So ordered.

---

9. Under either test noted in fn. 9 of our prior opinion.